[Civ. No. 22544. Second Dist., Div. One. July 16, 1958.]

EDGAR T. STONER, Appellant, v. ALEXANDER BISNO
et al., Respondents.

[Civ. No. 22614. Second Dist., Div. One. July 16, 1958.]

HENRY MEZORI, Appellant, v. ALEXANDER BISNO
et al., Respondents.

William H. Neblett, John G. Sobieski and John Sobieski for Appellants.

Sol D. Seldin, Buchalter, Nemer, Coyle & Cooper, Richard B. Coyle, Leon M. Cooper and Joseph Weissman for Respondents.

FOURT, J.—These are appeals from judgments determining that money loaned in anticipation that the funds would be used in the acquisition of certain interests in the Moulin

Rouge Hotel, an interracial hostelry and gambling casino at Las Vegas, Nevada, were not securities within the meaning of the California Corporate Securities Law requiring a permit from the Corporation Commissioner authorizing the transaction as a sale. The causes of action in both amended complaints are the same, and the cases were consolidated for trial, and by court order on stipulation of the parties, the two appeals have been consolidated for hearing.

The master plan for building the Moulin Rouge Hotel was to raise $1,200,000 for the sale of 100 units of $12,000 each. In late 1954 and early 1955 when the hotel was about 90 per cent completed, additional money was needed and Henry Kawin, a certified public accountant with offices adjoining those of Alexander Bisno, conferred with him relative to a plan for selling an additional 10 units for $120,000. Kawin subsequently did turn over $113,500 (including all sums involved herein) to Alexander Bisno for use in the construction of the Moulin Rouge Hotel.

The facts with respect to the Mezori case are substantially as follows: Jerome Steier is Kawin's brother-in-law and the bookkeeper for plaintiff Henry Mezori. Steier made an appointment for Kawin to meet Mezori, his sister Emeline Dawson and Sol Rose at Mezori's offices. Mrs. Dawson delivered her check in the amount of $12,000 to Kawin, which check was made payable to Henry Kawin, trustee. She also executed a typewritten form letter directing Kawin to loan the funds to the organization which was about to build the proposed hotel under a cooperative joint deed of trust to a collective unit of which she was to comprise a part, which unit was to participate in the net profits of the operations of the proposed hotel. The letter also contained the following provision: "It is understood, of course, that if I do not personally approve the final organizational papers, I shall have the privilege of withdrawing my money, but of course I will forfeit any interest that my money would otherwise have entitled me to."

Kawin endorsed the check "For investment in the Moulin Rouge Hotel of Las Vegas, Henry Kawin, Trustee" and deposited it in his trust account.

Substantially the same procedure was later followed as to Sol Rose, whose check was for $6,000, and as to Henry Mezori, whose check was for $12,000. When these funds had all been received by Kawin he drew a trustee check for $30,000 payable to Moulin Rouge Trust Account, and delivered same

to Alexander Bisno. The funds were later deposited into the Moulin Rouge Trust Account at the First National Bank of Nevada at Las Vegas, and apparently were used and spent on the Moulin Rouge Hotel.

Subsequently Emeline Dawson and Sol Rose assigned their rights to Mezori.

In the Stoner case, Charles Keefer, who is Kawin's uncle, brought Edgar T. Stoner and his assignor Norman E. Smith to Kawin's home. Stoner gave Kawin two checks totaling $6,000 and Smith gave Kawin a check for $2,000. Each of them also executed a typewritten form letter directing Kawin to loan the funds to Bisno and Bisno for 30 days with the understanding that when the gambling license for the Moulin Rouge had been issued, the party would then make application with the Nevada Tax Commission to become a licensee of Moulin Rouge, and upon approval, the funds would be applied to acquire an interest in the Moulin Rouge, which interest would be held in the name of Henry Kawin, Trustee. These funds were deposited in Kawin's trust account and Kawin drew one check payable to the order of Bisno and Bisno in the amount of $6,000 and another in the amount of $4,000 (of which $2,000 represented Smith's payment), and on each of which was written in the upper left hand corner of the check, "Endorsement of this check acknowledges receipt in full of the following item. Loan with option to acquire an interest in Moulin Rouge. It was stipulated that thereafter the funds were put into the Moulin Rouge Hotel at Las Vegas, Nevada.

Mezori and Stoner sued Alexander Bisno, Henry Bisno and Henry Kawin for damages in the sums paid to Kawin, plus interest alleging that the transactions were sales of securities consisting of participating interests in the Moulin Rouge Hotel, and that they were void in that there had not been compliance wtih the requirements of the Corporate Securities Law of the State of California or with the regulations of the Federal Securities and Exchange Commission. On motion of plaintiff made during the trial, the cause of action in each case relating to violations of the Federal Securities Act was dismissed with prejudice.

Separate findings of fact were made with respect to each sum advanced to Kawin by the respective parties in each of the cases. Some of the more significant findings relating to transactions with Mezori are set forth hereinafter:

"II. That each and all of the allegations set forth in Para-

graph II of the alleged First Cause of Action of Plaintiff's First Amended Complaint are untrue, except as follows:

"1. That it is true that no application was made to the Corporation Commissioner of California for a permit, nor was a permit granted by said Corporation Commissioner, authorizing the issuance and sale, within the State of California, of certificates representing percentages of interest in the Moulin Rouge Hotel of Las Vegas, Nevada.

. . . . . . . . . . . .

"V. That each and all of the allegations set forth in Paragraph V of the alleged First Cause of Action of Plaintiff's First Amended Complaint are untrue, except as follows:

"1. That it is true that on or about February 8, 1955, plaintiff loaned to Defendant, Alexander Bisno, the sum of Twelve Thousand Dollars ($12,000.00);

"2. That it is true that Plaintiff made demand upon Defendant, ALEXANDER BISNO. for repayment to him of his loan to said Defendant, ALEXANDER BISNO, in the sum of Twelve Thousand Dollars ($12,000.00);

"3. That to represent the said loan, the said defendant, ALEXANDER BISNO, made, executed and delivered in a bona fide way in the ordinary course of legitimate business his Promissory Note unto HENRY KAWIN as Trustee for Plaintiff, HENRY MEZORI, dated February 14, 1955, in the amount of Twelve Thousand Dollars ($12,000.00), payable ten (10) days after demand, with interest at ten percent (10%) per annum from February 14, 1955.

"VI. That each and all of the allegations set forth in Paragraph VI of the alleged First Cause of Action of Plaintiff's First Amended Complaint are untrue, except as follows:

. . . . . . . . . . . .

"2. That the Plaintiff has stipulated in open court by and through his counsel, WM. H. NEBLETT and HARRY W. DUDLEY, that he prays for a Judgment herein based upon only a violation of the Corporate Securities Law of the State of California and did not nor does he pray or seek a Judgment based upon the said loan of HENRY MEZORI or the said Promissory Note referred to in Paragraph V of these Findings, and Plaintiff further stipulated that he waives any Judgment on said loan or said Promissory Note to which he might otherwise be entitled.

. . . . . . . . . . . .

"XXIX. That no security, nor interest in a security, as defined in the Corporate Securities Law (Sec. 25008 of the

Corporations Code of the State of California) was issued or sold, or offered for sale, as defined by the Corporate Securities Law (Sec. 25009 and Sec. 26100 of the Corporations Code of the State of California), unto Plaintiff, or his Assignors, or either or any of them, by Defendants, or the Moulin Rouge Hotel of Las Vegas, Nevada, or either or any of them.

. . . . . . . . . . . .

"XXX. That there was no sale, nor offer to sell, nor transfer of any partnership interest, from Defendants, or either or any of them, unto Plaintiff, or his assignors, or either or any of them."

Appellants contend that the findings are not supported by the evidence and are contradictory to the evidence; that the findings upon which the conclusions of law are based and upon which the judgment rests are outside the issues raised by the pleadings; and that the facts show the defendants Alexander Bisno, Henry Bisno and Henry Kawin conspired to sell and, in California, did sell to the public, including plaintiffs, securities in the Moulin Rouge Hotel of Las Vegas, Nevada, without a permit from the Corporation Commissioner of California authorizing the sales.

Appellant argues "It does not matter whether Kawin extracted the $30,000 from the plaintiff and his assignors through the device of a loan, trust arrangement or what. The result is the same. The $30,000 found its way into the Moulin Rouge Hotel as an investment therein for which plaintiff and his assignors were to receive a participating interest. . . . It was a clear violation of the Corporate Securities Law for Kawin to take $30,000 from the plaintiff and his assignors pursuant to a prearranged plan between him and his co-defendants."

The sections of the Corporate Securities Law which it is claimed were violated by the transactions in question are as follows:

Corporations Code, section 26100: "Every security of its own issue sold or issued by any company without a permit of the commissioner then in effect authorizing the issuance or sale of the security is void. Every security of its own issue sold or issued by a company with the authorization of the commissioner but which has been sold or issued in nonconformity with any provision in the permit authorizing the issuance or sale of the security is void."

Corporations Code, section 26103: "Every company which directly or indirectly offers for sale, or negotiates for the sale of, or sells, or issues, or causes to be issued any security

contrary to the provisions of this division, or of the Constitution of this State, or in nonconformity with a permit of the commissioner authorizing it so to do, or which applies the proceeds from the sale of any security, or any part of such proceeds, to any purpose other than a purpose specified in the permit, or to any purpose specified in the permit in excess of any amount limited in the permit to be used for that purpose is guilty of a public offense punishable by a fine not exceeding ten thousand dollars ($10,000).''

Corporations Code, section 26104: ''Every officer, agent, or employee of any company and every other person, who does any of the following acts is guilty of a public offense punishable by imprisonment in a state prison not exceeding five years, or in a county jail not exceeding two years, or by a fine not exceeding five thousand dollars ($5,000), or by both such fine and imprisonment:

''(a) Knowingly authorizes, directs or aids in the issue or sale of, or issues or executes, or sells, or causes or assists in causing to be issued, executed, or sold, any security, in nonconformity with a permit of the commissioner then in effect authorizing such issue, or contrary to the provisions of this division, or of the Constitution of this State.

. . . . . . . . . . . . . .

''(g) With one or more other person, conspires to violate any permit or order issued by the commissioner or any provision of this division.''

Securities and sales thereof are defined in Corporations Code, sections 25008 and 25009 as follows:

Corporations Code, section 25008: '' 'Security' includes all of the following:

''(a) Any stock, including treasury stock; any certificate of interest or participation; any certificate of interest in a profit-sharing agreement; any certificate of interest in an oil, gas, or mining title or lease; any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings.

''(b) Any bond, any debenture, any collateral trust certificate; any note; any evidence of indebtedness, whether interest-bearing or not.

''(c) Any guarantee of a security.

''(d) Any certificate of deposit for a security.''

Corporations Code, section 25009: ''(a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value.

" 'Sale' or 'sell' includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale; a taking of a subscription; an exchange; any change in the rights, preferences, privileges, or restrictions on outstanding securities.

"(b) Any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing is conclusively presumed to constitute a part of the subject of the purchase and to have been sold for value.

"(c) A privilege pertaining to a security giving the holder the privilege to convert that security into another security of the same company is not a sale of the other security within the meaning of this section.

"The issue or transfer of a right pertaining to a security and entitling the holder of that right to subscribe to another security of the same company shall not be deemed a sale of such other security within the meaning of this section; but the sale of the other security upon the exercise of the right is subject to the provisions of this division."

. In the present cases, the trial court upon conflicting evidence found the transactions not to be within the act. ▮ In a criminal prosecution for violation of the Corporate Securities Law, the state is not bound by the written provisions of the civil contracts between the parties. ▮ It is likewise true that "[t]he understanding or misunderstanding of the parties as to the nature of the transaction is not determinative of its legal effect." (*People* v. *Sidwell,* 27 Cal.2d 121, 126 [162 P.2d 913].) ▮ The cases are legion that the substance and not the form of the transaction should be the criterion used in determining its character. In these cases, we think a finding by the trial court that the transactions were within the proscription of the Corporate Securities Law would have been amply supported by substantial evidence. However, this does not permit us to disturb the trial court's contrary determination if there was substantial evidence to support it. (See *People* v. *Sidwell, supra,* at pages 128 and 129 and cases cited thereat.)

▮ As is stated in *People* v. *Rankin,* 160 Cal.App.2d 93 at pages 100-101 [325 P.2d 10], in quoting with approval from *People* v. *Thomas,* 103 Cal.App.2d 669, 672 [229 P.2d 836]: " 'The trier of fact may believe and accept a portion of the testimony of a witness and disbelieve the remainder. ▮ On

appeal that portion which supports the judgment must be accepted, not that portion which would defeat, or tend to defeat, the judgment. (Citations.) A judgment cannot be set aside on appeal unless it clearly appears that on no hypothesis whatever is there sufficient substantial evidence to sustain it. (Citation.)' ''

 The basic and fundamental issue presented by this appeal is: Was there substantial evidence to support the findings of the trial court that the transactions in question were loans, and the findings of fact that there were no sales, nor offers to sell, nor transfers of securities within the proscription of the Corporate Securities Law?

 It is well stated in *People* v. *Syde*, 37 Cal.2d 765, 768 [235 P.2d 601], that ''[t]he Corporate Securities Law does not contain an all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute *is a question to be determined in each case.* In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and securities based thereon.''

A somewhat analogous factual situation was before the court in *Nicholl* v. *Ipsen*, 130 Cal.App.2d 452 [278 P.2d 927], and in ruling that the transaction there involved was *not a* security within the meaning of the Corporate Securities Law, the court commented at pages 457 and 458 that ''the purpose of the Corporate Securities Law was to protect the public, as well as to safeguard individual purchasers and subscribers or creditors, and that an ordinary note, whether secured or unsecured, not offered to the public or sold to an underwriter for resale, is not 'security' requiring a permit. In the instant case it appears that the business first contemplated was a joint adventure or partnership, and plaintiffs were to engage in such joint adventure or partnership with defendants. In fact, nearly all planning and business arrangements were done by plaintiff after the agreements were signed and plaintiffs were to have control over the expenditures of any money by said partnership. . . . It might be well believed that these advances were made and that this note was issued under the original memorandum agreement. Under it, the respective interests of the parties in the 'tentative oral partnership'

were agreed upon and therein indicated. . . . Therein it was also agreed that thereafter they would immediately incorporate. . . . They agreed, however, that pending the incorporation, they would advance portions of it, by way of a loan to defendants, to be represented by the promissory notes indicated. The only time this investment was not to be considered a loan would be if the shares of stock were issued and were transferrable, in which case it was to be considered that the loan was paid.''

We view the present situation as clearly distinguishable from the swindle technique described by Mr. Justice Herndon in his concurring and dissenting opinion in *People* v. *Rankin, supra,* in which he states at page 103, ''[q]uite typically, six of the seven victims were elderly women.''

In marked contrast is the testimony of Henry Mezori on cross-examination, as follows:

''Q. What is your business, sir? A. I am in the automotive parts business.

''Q. For what period of time have you been in business in Los Angeles? A. Since 1934.

''Q. You are president of your company? A. Yes, sir.

''Q. Back in February of 1955 you first were advised about the Moulin Rouge by your sister, weren't you, Mrs. Dawson? A. Yes, sir.

''Q. And she told you that she had some information on the Moulin Rouge and it looked like a good deal, didn't she; isn't that right? A. Yes, sir.

''Q. And at that time, in the month of February, being, I assume, a successful business man, you were always looking for deals where you might realize a profit, weren't you? A. Periodically I looked for a deal for a profit.

''Q. That is right. You had driven by and you had seen the Moulin Rouge under construction in October of 1954, hadn't you? A. I had, not knowing what it was.

. . . . . . . . . . .

''Q. She first told you about the Moulin Rouge on the telephone, didn't she? Wasn't it a telephone conversation? A. Yes, sir.

''Q. That is right, isn't it? A. Yes, sir.

''Q. And it sounded pretty good to you, didn't it? It sounded to you like something from which you could make a dollar; isn't that right? A. It didn't sound pretty good to me. I stated to her over the telephone that it appears to me

that it bears investigation and I would like to have her set up an appointment.

"Q. So, pursuant to your request, as you know, Mrs. Dawson set up a request with Mr. Henry Kawin; isn't that right? A. I don't think so.

"Q. With whom did she set it up? A. I think she told Mr. Steier to set up an appointment with Mr. Kawin.

. . . . . . . . . . .

"Q. Mr. Mezori, when your sister talked to you on the telephone and she first told you about the Moulin Rouge, one of the things she told you was that some of the information which was imparted to you was that she had gotten that information from your employee, Mr. Steier; isn't that right? A. No, sir, not some of the information, the information.

"Q. The information. In other words, she got the whole story from Jerome Steier? A. She got a story that a deal was available."

In our opinion, the factual situation approaches that before the court in *Wells* v. *Comstock,* 46 Cal.2d 528 [297 P.2d 961], where the court stated (at p. 531): "Both parties advance arguments based upon the general purpose of the Corporate Securities Act to protect the public against fraudulent or unlawful stock schemes. Where, as here, both parties with full knowledge have joined in the illegal scheme, there can be no problem of applying the above quoted sections of the Corporate Securities Act to protect one from the other. (Citations.)"

The judgments are affirmed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 8, 1958, and appellants' petition for a hearing by the Supreme Court was denied September 10, 1958. Traynor, J., was of the opinion that the petition should be granted.