[Crim. No. 6685. Second Dist., Div. One. June 10, 1960.]

THE PEOPLE, Respondent, v. LEIGH HERRICK
WOOLSON, Appellant.

Henry F. Poyet and Earle K. Stanton for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was convicted by the court, a jury having been waived, of the crime of grand theft (Pen. Code,

§ 487, subd. 1), and two violations of the Corporate Securities Act (Corp. Code, § 26104, subd. (a)). He has appealed from the judgment of conviction. Since the sole assignment of error is the insufficiency of the evidence to show either a theft or a sale of a security, we summarize in some detail the facts presented.

The grand theft accusation involved the payment of $15,000 by one Robison, now deceased, to the defendant on or about August 19, 1955. The parties had met each other in September or October of 1954. Prior to this meeting, both had spent considerable time in Mexico where, they learned, there was an embargo on gold and a prohibition against the sale or possession thereof by anyone except the Mexican Government; they also became apprised of the fact that there was a flourishing black market in the commodity, and both concluded that there would be a profitable business future in the matter of buying crude gold from "campesinos" or "little fellows" (usually Yaqui Indians) at a low price and selling it legitimately to the Mexican Government. The defendant told Robison that he had been working on the same idea for some time; that through an attorney named Rosas he had arranged with the government mint, the Banco de Mexico and the Department of the Interior for the necessary permit (which was shown to Robison) giving defendant and his corporation, the Impex Corporation, authority to purchase gold legally and thereafter sell it to the Banco de Mexico (stated to be similar to this country's Federal Reserve Bank) or the mint. On March 16, 1955, the parties entered into a written agreement; prior thereto each had verbally undertaken to supply to the other his knowledge of Mexico, the defendant stating that he would proceed to Mexico "and get the organization ready, and we will buy gold and we will sell it, and we will carry the business on in the name of Impex Corporation (with whom) we have a contract . . . to purchase and sell gold"; Robison was also told by defendant that the parties would share in the profits "and whatever he shared I would get half." The agreement read as follows:

"This agreement made and entered into this Sixteenth day of March, 1955, by and between Leigh Woolson, hereinafter designated as Woolson, and Ariel Q. Robison, hereinafter designated as Robison,

"WITNESSETH:

"Woolson, through his interest in IMPEX-CORP., S.A. Avenue Juarez 64, 712 Mexico City, D.F. Mexico, has an opportu-

nity to complete some work for the corporation which was started in Mexico about a year ago, and which necessitates a journey to Mexico City, Mexico and may require a prolonged stay of several weeks in completing the transaction. Woolson requires some funds to pay such expenses and has offered Robison one half of all of the moneys he received from the business transaction in consideration of the sum of One Thousand Dollars ($1,000.00) from Robison to cover said expenses.

"The IMPEX-CORP., S.A. has been designated by the Mexican Government an [sic] their agent to purchase Gold in various forms from whatsoever sources that may tender the metal to said corporation and some large quantities of such metal have been offered to Woolson to be delivered in Mexico City to said corporation, to be assayed and its value and purity determined and sold to the said corporation, which in turn will sell such metal to the Mexican Government through a designated bank. There should be a substantial return to Woolson and others in such transaction and therefore Woolson and Robison are willing to spend their time and money in and [sic] effort to complete the business to their mutual gain.

"Now Therefore; for and in consideration of the sum of One Thousand ($1,000.00) Dollars in hand paid by Robison to Woolson, the receipt of which is hereby acknowledged by Woolson, and of the mutual pormises [sic] by the parties hereto, each unto the other, the parties hereby agrees [sic] as follows:

"1. Woolson agrees to promptly journey to Mexico City and arrange with the owners of the Gold Metal to deliver it to the IMPEX-CORP., S.A., where it will be assayed and valued and then delivered to one of the banks for the Government of Mexico and in turn IMPEX will pay the owners a price to be agreed upon for said metal, which will be less than the amount which IMPEX will pay for said gold.

"2. This transaction may require considerable time and more expenses than the sum of $1,000.00 being advanced by Robison, but such additional expenses will be defrayed from the transaction by IMPEX out of the moneys realized from the operation.

"3. Upon completion of the transaction all of the expenses thereof will be paid, incuding [sic] the moneys advanced by Robison and Woolson's share of the moneys realized therefom [sic] will be devided [sic] equally by and between Robi-

son and Woolson, at such time and place as may be mutually agreed upon.

"IN WITNESS WHEREOF, each of the parties have signed this agreement in Los Angeles, California, this date as first above written.

Leigh Woolson

Ariel Q. Robison"

As provided therein, Robison gave defendant $1,000 on the date of the agreement; subsequently, on March 21, 1955, he gave defendant an additional $1,200, a notation of which was made on the face of the instrument, for the general purposes set forth in the agreement. Thereafter the defendant made several trips to Mexico being accompanied on some of them by Robison. In April of 1955, he brought Rosas, the Mexican attorney, to Robison's home for lunch. At the end of June (or thereabouts) of the same year, the parties drafted another agreement dated October 16, 1954, which they attempted to relate back to the date of their first meeting; in substance, after reciting matters already mentioned and predicated on the parties' mutual interest in the business venture previously described, it provided that the defendant would journey to Mexico, contact suppliers and buyers of gold and endeavor to purchase such gold for Impex Corporation at a price returning a profit upon any subsequent sale; it was further provided that defendant and Robison would share equally in any profits and losses resulting from the business. No further money was paid in connection with this second agreement.

Robison and the defendant drove down to Jalisco in mid-June of 1955 and then to Hermosillo; on the way back they saw Mr. Rosas in Jalisco, and there was a conversation between Rosas and the defendant concerning the Yaqui Refining Company (Refinadora del Yaqui) of which Rosas was president and defendant general manager (gerente general). Robison testified that he had no interest in this company which Rosas and defendant "operated on their own"; thus, Rosas "stated that this corporation was to be used to buy and refine gold, that they would operate the corporation and that it would still be separate and apart from any other transaction." The defendant and Rosas, Robison was given to understand, had arranged to get the Mexican Government to advance substantial credit to buy gold, and they were in need of $2,500 for the expenses incident thereto. On July 8, 1955, Robison borrowed $5,000 from one Ginsberg; of this sum, he gave defendant $1,500

in currency and a cashier's check for $2,500, endorsed to the Impex Corporation, which funds "were to be used for expenses in the Mexican gold project." About August 10, 1955, the defendant, Robison, Ginsberg, and a Mr. Aminoff and a Mr. Balton had a meeting at which the matter of additional money to be put up by the last three named parties was discussed. The defendant stated that he needed money to show good faith, "to be deposited in a bank to show his responsibility." The same group had another meeting on August 19, 1955; defendant said that he had transactions in Mexico already waiting for him, and that he needed money immediately for the purpose of establishing credit in Mexico so that he could do business by buying gold from Yaqui Indians and others and thereafter sell the gold to "the Reserve Bank at Mexico" for a profit. Defendant suggested the sum of $20,000, only a portion of which would be used for necessary expenses. Balton gave Robison a check for $20,000, payable to the latter's order; he told Robison, in the defendant's presence, that $5,000 could be used by defendant in connection with the gold operation, but the balance was not to be touched without further approval and left on deposit in a bank at Hermosillo. Later that day Robison gave the defendant Balton's check, endorsed by Robison to the Refinadora del Yaqui; he told defendant explicitly that it was to be deposited in the Banco de Mexico Nacional at Hermosillo; that $5,000 could be used for expenses, but under no circumstances was the balance of $15,000 to be expended without Robison's specific authorization. The defendant prepared, signed and delivered to Robison a receipt as follows:

"Receipt Date Aug. 19th, 1955

"Received from Ariel Q. Robison, Address Glendale, Calif. Twenty thousand dollars $20,000 For Loan—Spending limit $5,000.00 without further authorization.

> Cia. Refinadora del Yaqui
> By /s/ Leigh Woolson, Gen. Mgr."

Robison became ill the day after the above transaction and was incapacitated for some 60 days. He tried to contact the defendant by telephone, finally reaching him in Mexico City on October 17th. In addition to other inquiries, Robison asked the defendant if the deposit had been made, and the defendant replied "Yes, the money is deposited in the bank, and it is still there in Hermosillo." A week or so later the defendant returned to Los Angeles and told Robison, Balton, Ginsberg

and Aminoff at a meeting that "the money was still safe in the bank at Hermosillo." At another meeting shortly thereafter he told the same group, after giving a progress report, that he would like to use some of the fifteen thousand dollars; Robison and Ginsberg replied that the agreement prohibited any such use of the fund; at still another meeting, the defendant again stated that the money was still intact in Hermosillo.

After November 27, 1955, the date of the last mentioned meeting, Robison was unable to contact the defendant, although he endeavored to do so in Hermosillo where the latter maintained his home and his office. The records of the Nacional Bank of Mexico at Hermosillo revealed that from August of 1955 the defendant had no deposits of any kind in his name, nor was there any account in the name of Refinadora del Yaqui. None of the money was ever returned to Robison; also, at no time did he ever authorize the defendant to use more than $5,000 of the $20,000 in question.

The first violation of the Corporate Securities Act, being count two of the information, involved the above series of matters. The second violation, count three of the information, pertained to a transaction on June 4, 1955, with one Perry whom the defendant had then known for about a month. The defendant told Perry that he was dealing in gold in Mexico, that he had organized the Yaqui Refining Company with which to purchase gold and sell it to the Mexican Government for a profit. According to the defendant, he needed money to go to Hermosillo. Perry gave him a check for $1,000 and the defendant signed and delivered to Perry the following document entitled "Specific Performance Trust":

"This Specific Performance Trust made this 4th day of June, 1955, by and between Robert B. Perry of Los Angeles, California, hereinafter called Trustor, and Leigh Woolson of Los Angeles, California, hereinafter called Trustee, is for the purpose of establishing an assay and refining plant in the State of Sonora, Mexico, and as hereinafter further described.

"I, the Trustor, therefore hand you herewith the sum of One Thousand Dollars ($1,000), and said sum to be acknowledged herewith as having been received by the Trustee, to be used to put such a plant into immediate operation, and in accordance with a proposed budget attached hereto under the name of Cia. Refinadora del Yaqui, S.A.

"Now more specifically, this money is to be used as working capital and to establish the facilities, machinery, and equip-

ment with which such assay, smelting, and refining is to be done.

"For and in consideration of the Trustor advancing these funds, the Trustor is to receive the sum of $.05 per thousand fine troy ounce of gold transacted under this trust operation. Payments are to be made monthly against C.P.A. statements covering all transactions.

"This Trust Agreement shall continue until such time as 600,000 fine ounces of material have been processed and sold to the government of Mexico, and accounting made and paid in full under this agreement.

"It is further understood that the trustee shall have the right and privilege to extend his authority under this Trust Agreement to others, but will remain responsible for the actions thereof.

"SIGNED:

Robert B. Perry (Trustor)

and /s/ Leigh Woolson

Leigh Woolson, Trustee"

It was established that no permit was ever issued by the Corporation Commissioner to the defendant or to Refinadora del Yaqui authorizing either to sell a certificate of interest for participation in a profit-sharing agreement.

The defendant did not take the stand, although upon completion of the prosecution's case there was received in evidence a check register of Refinadora del Yaqui showing certain expenditures (totalling $13,023.55) in connection with the operation of that business.

Appellant's first contention is that the evidence fails to show a theft under any theory. The offense, as defined by section 484 of the Penal Code, includes theft by trick and device, theft by false pretenses, and embezzlement (*People* v. *Jones,* 36 Cal.2d 373, 376, 377 [224 P.2d 353]; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]). ■ "Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty, if they find that an 'unlawful taking' has been proved." (*People* v. *Ashley, supra,* 258.) ■ Where, as here, the only basis of appeal is insufficiency of the evidence, the judgment must be affirmed if there is sufficient evidence to support the conviction on the theory of theft by trick and device, or by false pretenses, or by embezzlement (*People* v. *Reinschreiber,* 141 Cal.App.2d 688, 696 [297 P.2d 658]).

■■ "Larceny by trick and device is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession" (*People* v. *Ashley, supra,* 258); embezzlement is defined as the fraudulent appropriation of property by a person to whom it has been entrusted (Pen. Code, § 503), the gist of the offense being the appropriation to the accused's own use of property delivered to him for devotion to a specified purpose other than his own enjoyment of it (*People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38]). Appellant urges that a theft was not established because there was no fraudulent appropriation; the receipt signed by him negatived any claim of embezzlement; the place of deposit of the money was immaterial; the "theory" that the $15,000 was to remain on deposit in a bank was immaterial; and, the relationship of Robison and appellant being assertedly that of partners or joint adventurers, there can be no embezzlement by one in that relationship of money advanced for the use of the partnership or joint venture.

Preliminarily, appellant prefaces his argument with the statement that "(c)rimes cannot be built up by the courts by the aid of inference, implication and strained interpretation," citing *People* v. *Zimbrolt,* 35 Cal.App.2d Supp. 745 [91 P.2d 252], and *People* v. *Garcia,* 37 Cal.App.2d Supp. 753 [98 P.2d 265]. ■■ Both cases turned on the proper construction of penal statutes, whereas in the case at bar there is no such problem with definitive decisions like *People* v. *Jones, supra,* and *People* v. *Ashley, supra,* to guide us; on the contrary, the rule restated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], is applicable and by it we must assume in favor of the finding below the existence of every fact reasonably deducible from the evidence and then determine whether such facts are sufficient to support the judgment. We also comment on another assertion of the appellant, the general tenor of which permeates his brief, that "(T)he entire record depicts nothing other than a disgruntled partner or joint adventurer who has attempted to utilize the criminal courts as a sort of a collection agency." It is simply trite to observe that the appellant is being prosecuted for acts forbidden by law; the plaintiff is the State of California and the victim merely a witness whose ultimate gain or loss is immaterial; furthermore, it avails appellant nothing to complain that Robison should not be permitted "to gainsay his agreements" which are said to be clear and unambiguous and

governed by "the rules of evidence in criminal cases (which) are, generally speaking, the same as those in civil cases (*People* v. *Stevenson*, 103 Cal.App. 82 [284 P. 487])"; the People prosecuting for a crime in relation to a contract are not parties to the contract and are not bound by it (*People* v. *Sidwell*, 27 Cal.2d 121, 126 [162 P.2d 913]).

 To constitute theft by trick or device, the following elements must be present: (1) there must be a taking; (2) there must be an asportation of the thing taken; (3) the thing taken must be the property of another; and (4) the taking and carrying away must be with an intent, without claim or pretense of right or justification, to deprive the owner of his property wholly and permanently (*People* v. *Bartges*, 126 Cal.App.2d 763, 770 [273 P.2d 49]). Without again setting forth the evidence in detail, suffice it to say that it clearly shows that appellant, with a preconceived design to appropriate the money to his own use, obtained possession of it by means of fraud and trickery. The fraud having vitiated the transaction, the owner is still deemed to retain possession of the property constructively. An owner does not part with title to the alleged thief where, as in the instant case, he delivered it to the appellant to be applied by the latter to a particular purpose, namely for deposit in a bank at Hermosillo under certain conditions; and the recipient, having obtained possession with the preconceived intention to appropriate the money to his own use, subsequently did so convert it instead of applying it to the purpose contemplated by the owner. Hence there was here in contemplation of the law of larceny a "taking."

The element of "asportation" is shown by evidence that when appellant obtained delivery of the money from Robison he did not intend to devote it to the use for which it was given him but to convert to his own use; upon receipt of the money, the conversion was complete. This deduction appellant attempted to negative upon the trial by the production, through his attorney, of a register of checks (totaling $13,023.55) expended out of the $15,000 for carrying on the business. There is nothing therein to indicate that the checks were issued for the benefit of Refinadora del Yaqui, in which Robison had no interest at all, to persons (some unnamed) for purposes considerably short of $20,000; the balance, $6,976.45, was unaccounted for and, it may be presumed, was feloniously converted (*People* v. *Costello*, 107 Cal.App.2d 514, 517-518 [237 P.2d 281]).

As to the third element (the thing taken must be the property of another), since the money belonged to Robison and appellant acquired it by fraud, his holding was without right, and title thereto did not pass to him (*People* v. *Bartges, supra,* 770). ■ With respect to the claim (extensively argued) that appellant and Robison were joint venturers or partners, the evidence shows that the $15,000 was advanced to the appellant for deposit in the name of Refinadora del Yaqui only and that appellant acted on behalf of that organization in which, as already narrated, Robison had no interest whatsoever. ■ Furthermore, the question as to the existence or otherwise of the relationship asserted was primarily "for the trial court to determine from the facts and the inferences to be drawn therefrom" (*Spier* v. *Lang,* 4 Cal.2d 711, 716 [53 P.2d 138]); the same principle is applicable to joint ventures (*Goldberg* v. *Paramount Oil Co.,* 143 Cal.App.2d 215, 220 [300 P.2d 329]). ■ To constitute a partnership relationship, "there must be (in the agreement) such community of interest as empowers each party to make contracts, incur liabilities, manage the whole business. . . . The association must be one for the purpose of jointly carrying on the business" (*Smith* v. *Grove,* 47 Cal.App.2d 456, 461-462 [118 P.2d 324]). ■ To constitute a joint venture "there must be a community of interest in the enterprise, a sharing of profits and losses, and joint participation in the conduct of the business" (*Lasry* v. *Lederman,* 147 Cal.App.2d 480, 485, 486 [305 P.2d 663]). ■ Under the agreement of March 16, 1955, Robison paid appellant $1,000 in consideration of which appellant agreed to proceed to Mexico and arrange for the purchase and sale of gold, and upon completion of the transaction the appellant's share of the net money realized would be divided equally with Robison. The trier of fact was authorized to conclude that "there was no joint participation in the management and control of the business, and the proposed profit-sharing was contemplated only as compensation or interest for the use of the money advanced" (*Spier* v. *Lang, supra,* 716). The same applies to the document of October 16, 1954, although executed in June or July of the following year. ■ However, even if a partnership did exist, appellant "cannot escape criminal liability by reason of the same device upon the theory that the defrauded parties, by becoming members of the partnership to which they contributed their money pursuant to his representations, retained such an interest in that fund as to preclude defendant's conviction of the crime

of grand theft 'sounding in false pretenses . . .' " (*People* v. *Jones,* 36 Cal.2d 373, 382-383 [224 P.2d 353]). ▮ Much emphasis is placed by appellant on the fact that the receipt for the $20,000 recites that it was a "loan"; while generally a loan transaction creates only civil rights and obligations, the borrower may be held criminally liable where the evidence sufficiently shows larceny by trick and device (*People* v. *Reed,* 113 Cal.App.2d 339, 352 [248 P.2d 510]); too, the document on its face indicates that it was a receipt from Refinadora del Yaqui, in which Robison had no interest, and it specifically declares that the spending limit was $5,000 in the absence of further authorization. ▮ Finally on this phase of the case, appellant also argues that the place of deposit was immaterial. As heretofore mentioned, the money was not given to appellant for use by him in connection with his agreement with Robison but rather as manager of Refinadora del Yaqui and with the understanding that $15,000 thereof was to remain on deposit; under the circumstances Robison certainly had a right to know where the fund (to be kept intact) was being held. With respect to appellant's further claim that Robison's testimony in this regard is unworthy of belief because the money, if left untouched, "would be of no possible use to anyone," it must be remembered that the untouched portion of the fund was "to establish credit" and not, as appellant says, "to buy gold from the Yaqui Indians." Robison's testimony remains uncontradicted since appellant did not choose to take the stand and deny Robison's statement that on more than one occasion he was told by appellant that the money was "intact" and on deposit "at Hermosillo." This failure to testify emphasizes the weight of inferences presumably drawn (*People* v. *Ashley,* 42 Cal.2d 246, 268 [267 P.2d 271]).

▮ The fourth and last essential of larceny, that is the felonious intent, without claim or pretense of right or justification to deprive the owner of his property wholly and permanently, was amply established by the evidence already summarized. Thus, $20,000 was given by Robison to appellant with instructions that $15,000 thereof was not to be touched without Robison's specific authorization. Not only did appellant fail to deposit the money at Hermosillo (although he later advised Robison that he had done so) but Robison never got the money back. Clearly there was justification for the conclusion by the trier of fact that, upon delivery of the $15,000 to appellant, the latter intended to use it for his own personal purposes, thereby depriving Robison of the money permanently and wholly.

Appellant's conviction on the theory of theft by embezzlement is also challenged. He concedes that in a proper case, namely, the misuse of partnership funds, the partner converting the money to his own private and ulterior uses could be found guilty of embezzlement. We are unable to agree with appellant's argument that there is nothing in the record which establishes this type of theft; under the facts presented, a sufficient showing was made that appellant appropriated to his own use property delivered to him for devotion to a specified purpose other than his own enjoyment of it (*People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38]).

"When defendant converted it to his own pocket that constituted embezzlement" (*People* v. *Hodges, supra,* 793).

Count II of the information charged appellant with selling to Robison "a security, to wit, a certificate of interest in a profit-sharing agreement, investment contract, certificate of interest in title to property, profits and earnings, to wit, 50 per cent of the profits to be derived from the purchase and sale of gold to the Government of Mexico, without first applying for and receiving" a permit from the Corporation Commissioner to do so. The "selling" is said to have occurred on March 16, 1955, and thus refers to the agreement of that date between the parties. Appellant contends that he did not sell a security to Robison on the date in question because the transaction constituted an entry into a partnership or joint adventure agreement. The principle has long been recognized that in ascertaining whether an instrument is a security within the meaning of the Corporations Code, the court may look through mere form to substance and consider the facts and circumstances surrounding its execution to determine the true intent of the parties, their mutual purposes and expectations and the potentialities of the rights acquired by the purchaser (*Oil Lease Service, Inc.* v. *Stephenson,* 162 Cal.App.2d 100, 107-108 [327 P.2d 628]). Accordingly, whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case (*People* v. *Syde,* 37 Cal.2d 765, 768 [235 P.2d 601]), and a finding that the transaction in question was within the proscription of the statute will not be disturbed if there was substantial evidence to support such a finding (*Stoner* v. *Bisno,* 162 Cal.App.2d 164, 171 [327 P.2d 922]). More particularly, "(I)f the transaction is one in which the assignee is merely an investor who for con-

sideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the interest representing such interest is a security," but where he "is to share in the conduct of the enterprise, the instrument . . . is not a security within the act." (*Austin* v. *Hallmark Oil Co.*, 21 Cal.2d 718, 727 [134 P.2d 777].)

We have already concluded that substantial evidence exists for the trial court's determination that the agreement of March 16, 1955, did not create a partnership or joint venture; hence, it did not come within the exemptions specified by the statute (Corp. Code, § 25100). On its face, the memorandum seems to have required nothing from Robison but the payment of $1,000; true, there is a recital that the parties are "willing to spend their *time* and money" to make the enterprise profitable, and Robison did take some trips to Mexico with appellant, but there is nothing in the record which indicates that Robison was to share in the conduct of the business. Again, appellant's failure to testify warranted the trial court in drawing an adverse inference upon this essential element of the crime charged (*People* v. *Rankin*, 160 Cal.App.2d 93, 100 [325 P.2d 10]). Finally, it is not disputed (nor could it be) that the agreement gave Robison the right to share in the profits which manifestly made it a security within contemplation of law.

The matters respecting the Perry transaction, constituting Count III of the information, have likewise been set forth. Appellant contends that he did not sell Perry a security because the money given to him was a temporary advancement which was soon repaid; furthermore, that the instrument was couched in layman's language and evidences nothing more than "a temporary advance" which is "entirely common in the business world." As in the agreement with Robison, nothing is suggested therein that Perry was to take part in the conduct of the refining plant operation, and no evidence was produced to show that he did so pursuant to such instrument. The principles of law, previously discussed, therefore control. The claim that the $1,000 represented an "advance" may or may not be significant; but in consideration thereof the appellant did issue a security and thereby became subject to the Corporate Securities Act. There is a suggestion that this count of the information lost its vitality or validity by reason of the claim that Perry was afterwards paid back by undertaking subsequent employment for appellant. There would seem to be no merit in any such claim because financial

loss to the investor is not a necessary element of the crime and, additionally, the decisive question is what was contemplated when the parties entered into the transaction; specifically, any subsequent recovery of Perry's investment by his own labors could not vary the terms of the agreement as they existed when the instrument was executed.

For the foregoing reasons, the judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied July 1, 1960, and appellant's petition for a hearing by the Supreme Court was denied August 3, 1960.