[No. G028341. Fourth Dist., Div. Three. Apr. 15, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN CUCCIA, JR., Defendant and Appellant.

## Counsel

Mark Raymond McDonald for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RYLAARSDAM, J.**—Defendant Stephen Cuccia, Jr., was found guilty of five counts of selling unregistered securities, one count of misrepresenting a security, and one count of attempted grand theft. He contends, among other things, that the trial court improperly forced him to testify out of order and erred by refusing to allow him to testify after the prosecutor was permitted to reopen rebuttal. We agree both incidents resulted in error and, while neither error is per se reversible, we conclude the cumulative effect of the errors violated defendant's due process right to a fair trial. We therefore reverse on that basis and remand the case for a new trial.

Our conclusion the case must be reversed moots the remaining issues raised on appeal except for defendant's contention the verdicts are not supported by substantial evidence. If correct, he would be entitled to an acquittal because the prohibition against double jeopardy would prevent his retrial (*People v. Hill* (1998) 17 Cal.4th 800, 848 [72 Cal.Rptr.2d 656, 952 P.2d 673]). However, we conclude there was sufficient evidence to support the verdicts on all seven counts.

### FACTS

In the mid-1990's, defendant operated a business called Creative Investments. Over a period of six months in 1995, he obtained $603,271 from Helen Smith, an elderly woman who, until then, kept her money in low-risk bank accounts and annuities. Defendant told Smith she would receive an 8 or 9 percent rate of return on her investments with him. He used some of her money to invest in three projects, only one of which was even marginally successful. Interest payments made to Smith on the unsecured promissory notes never came close to the projected 8 or 9 percent and eventually stopped altogether.

Smith was not the only elderly person who invested with defendant; however, the charges against him related solely to the money he received from her on five different dates. In counts 1 through 5, defendant was charged with offering and selling her a security "without having first applied for and secured from the Commissioner of Corporations of the State of

California, a qualification of such security and transaction." In count 6, he was charged with offering and selling Smith a security "by means of written and oral communications which included untrue statements of material facts and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." In count 7, he was charged with grand theft for taking property from Smith valued over $400. In addition, the trial court sua sponte instructed the jury on attempted grand theft.

As to the first five counts, it was undisputed the securities were not qualified. Defendant contended an exemption to the qualification requirement applied because the securities constituted a private offer to a very small number of people with whom he either had a preexisting personal or business relationship or who had enough business or financial experience to assume they were capable of protecting their own interests in the transaction. (Corp. Code, § 25102, subd. (f).) He did not have a preexisting relationship with Smith, who died before trial, but he tried to show she was an experienced and sophisticated investor. However, Smith's trustee and close friend, Ruth Gardner, testified Smith was not a savvy investor and had trouble balancing a checkbook.

The material omissions supporting count 6 included defendant's failure to disclose the amount of his fee to Smith, his failure to tell her some of her money would be used to pay off old investors, and his failure to inform her about financial problems associated with one of the projects. The prosecutor primarily relied on theories of false pretenses and embezzlement to support the grand theft charge in count 7. Defendant countered that he did not intend to permanently deprive Smith of her money, but was in the process of repaying other investors and had $57,039.53 set aside thus far in an account for Smith's estate. Several witnesses testified to receiving such payments.

## DISCUSSION

*Reversal Is Required Based on the Cumulative Effect of the Trial Court's Errors*

### 1. *Defendant Was Coerced into Testifying*

 Defendant argues his constitutional rights were violated because he was required to either testify out of order or rest his case when a scheduled defense witness could not be located. We agree.

At the beginning of the trial, the court told the parties it did not want the jury inconvenienced by having to wait for witnesses. The court stated, "I

want witnesses if need be to have to wait until their turn is called, but I want them stacked. [¶] If I find an abuse of that, I will do what I almost did a couple of weeks ago and conclude that the counsel has rested their case and proceed from there." The court reminded defense counsel of this after defendant's sixth witness was called but could not be located. Counsel stated, "I understand that, your honor. I guess the court's got to do what it's got to do." Then, in the presence of the jury, the court stated, "If I recollect, I thought you said you were going to call [defendant]. Have you changed your mind?" No objection was made; defendant took the stand and testified until the evening recess. The next day, defense counsel called the rest of the defense witnesses to the stand before he recalled defendant to complete his testimony.

During a recess in the middle of closing arguments, defense counsel moved for a mistrial contending the court erred by asking in front of the jury if defendant still planned to testify. The court rejected this contention, noting that counsel told the jury in opening statement that defendant was going to testify. Counsel did not press the issue.

Contrary to defendant's assertion, the circumstances in this case are not analogous to those in *Brooks v. Tennessee* (1972) 406 U.S. 605 [92 S.Ct. 1891, 32 L.Ed.2d 358], where, because a state statute required the defendant to testify first or not testify at all, the defendant decided not to testify. Here, defendant took the stand. In so doing, he waived the constitutional privilege against self-incrimination. (*People v. De Georgio* (1960) 185 Cal.App.2d 413, 421 [8 Cal.Rptr. 295]; *People v. Huerta* (1957) 148 Cal.App.2d 272, 274 [306 P.2d 505].) Nonetheless, we conclude his waiver was coerced based on the trial court's threat to consider his case rested if he did not testify.

█ "The right to testify and the right against self-incrimination are fundamental constitutional rights . . . ." (*People v. Vargas* (1987) 195 Cal.App.3d 1385, 1394 [241 Cal.Rptr. 360].) The denial of either federal constitutional right is reviewed under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], to see if the error was harmless beyond a reasonable doubt in light of all of the other evidence presented at trial. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309-311 [111 S.Ct. 1246, 1264-1266, 113 L.Ed.2d 302]; see also *Brooks v. Tennessee, supra*, 406 U.S. 605, 613 [92 S.Ct. 1891, 1895-1896] [petitioner entitled to new trial where court excluded him from testifying and state did not argue the error was harmless].)

█ Here, defendant does not explain how he was prejudiced by the violation of his constitutional rights, but simply contends the choice he was

given constituted "a gross miscarriage of justice . . . ." At oral argument his attorney stated defendant probably would not have testified if he had been permitted to make that decision after hearing the rest of his witnesses. However, from this alone, we cannot conclude the outcome of the trial would have been different. Defendant's testimony was the only evidence offered in some instances to explain what he did with Smith's money and what he told her about how her money would be used. He also countered documentary evidence indicating he used new investor funds to pay old investors by testifying that he kept between $200,000 and $300,000 in cash at home. Although several of his witnesses testified to receiving cash payments from him on occasion, defendant's testimony was nonetheless necessary to show the source of that cash. In sum, his testimony was necessary to defend against some elements of the charges against him. Consequently, viewed in isolation, the error in coercing him into testifying out of order was harmless beyond a reasonable doubt.

Setting aside the fact the court improperly asked in front of the jury if defendant still wanted to testify, the ultimatum to testify or rest his case also constituted an abuse of discretion under the circumstances. (See *People v. Blackburn* (1982) 139 Cal.App.3d 761, 763-766 [189 Cal.Rptr. 50] [trial court manifestly abused its discretion by resting the case for a defendant who was representing himself after learning his remaining witnesses did not plan to appear until that afternoon].) Here, the missing witness incident occurred mid-afternoon in the middle of the defense's case. There is nothing in the record to show defendant was less than diligent in securing the witness's presence for trial that day, and the witness appeared the next morning and testified. Although not requested, a brief continuance would have allowed defendant to present his other witnesses before deciding if he wanted to testify. However, for the reasons noted above, even in the absence of error, it is not reasonably probable defendant would have obtained a more favorable verdict. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## 2. *It Was Error to Deny Defendant's Request to Testify on Surrebuttal*

█ Defendant argues the court committed prejudicial error when it allowed the prosecutor to reopen and offer rebuttal evidence in the middle of closing argument without giving him an opportunity to offer surrebuttal. The new evidence consisted of defendant's signed declaration obtained from court records in a bankruptcy case and related to one of the investments. The court then refused to allow defendant to testify on surrebuttal. We agree that this was error.

█ "It is well settled that the trial court has broad discretion to order a case reopened and allow the introduction of additional evidence. [Citations.]" (*People v. Goss* (1992) 7 Cal.App.4th 702, 706 [9 Cal.Rptr.2d 412];

see also Pen. Code, §§ 1093, 1094.) Factors to be considered include: "(1) the stage the proceedings had reached when the motion was made; (2) the [moving party's] diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence. [Citations.]" (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1520 [28 Cal.Rptr.2d 758].)

■■■ The declaration introduced on rebuttal showed defendant knew as early as February 1995 that developer George Lambdin was having financial problems. This evidence was highly probative to show he knew the Lambdin investment was no longer profitable when he met with Smith and to impeach his testimony that he did not know the true extent of Lambdin's financial difficulties until later that year. Defendant testified earlier on cross-examination that he could not recall ever seeing an unsigned version of the declaration. The prosecutor conceded he could have obtained the signed declaration from the bankruptcy court records sooner, but he could not have anticipated defendant's testimony. The court concluded the evidence was "extremely probative" and outweighed any prejudicial effect to defendant based on the prosecutor's representations. It then ruled the evidence would be allowed in with a limiting instruction.

Defense counsel stated he would like to call additional witnesses to refute the declaration. The court said "[o]kay." Then defense counsel said he would need additional time to contact the attorney who prepared the declaration. The court asked what witnesses he intended to call and "[w]hat relevant testimony, if any, can they give or do you know?" Defense counsel was not certain, but thought he would call defendant and the attorney who prepared the declaration to discover "the circumstances under which that document was drafted . . . ." He continued, "I would like to find out if . . . defendant signed [the declaration] before it was even in a final draft or perhaps even written. [¶] I don't know what the circumstances it was prepared under. It was for a bankruptcy that he wasn't in control of." The court denied defendant's motion to reopen surrebuttal "for that purpose because I think the undue consumption of time given where we are in this case right now and the probative value to be ascertained or derived from that based on the representation you're making . . . ." The declaration was admitted into evidence over defendant's objection; the prosecutor then continued with closing argument.

Before making his closing argument, defense counsel moved for a mistrial contending defendant was not "allowed to take the witness stand even to address the reopened case on [the declaration], and I think that violates his due process [rights], his right to confront and cross-examine witnesses, and

call his own witnesses in his defense pursuant to the Sixth Amendment." The prosecutor disagreed with defense counsel's recollection that he was prevented from calling defendant to the stand and stated he had no objection if defendant wanted to testify.

The court then offered to let defendant testify again. Defense counsel declined the offer, indicating he was making a tactical decision not to call defendant. He further stated, "I just wanted to make . . . a fair, clear record that when I did want to do it, I couldn't. Now, I'm being allowed to do it but counsel is halfway through his closing argument." The court reiterated its reasons for denying defense counsel's earlier request to reopen and explained that it did not prevent defendant from taking the stand. "I simply said that I would deny your motion to reopen if you were looking to call some attorney to describe the circumstances under which that particular document was prepared, because as far as I was concerned, based on that representation, it was [an Evidence Code section] 352 issue that I ruled against you on. [¶] For the last time before I leave the bench and bring the jurors in, do you wish to call your client?" Defense counsel responded, "No, not any more."

Once the court decided to grant the prosecutor's request to reopen rebuttal to introduce the signed declaration, fairness dictated—at a minimum—that it also grant defendant a brief continuance so that he could discuss the new evidence with his attorney and testify on surrebuttal. (*People v. Carter* (1957) 48 Cal.2d 737, 754-758 [312 P.2d 665] [once prosecutor was allowed to reopen rebuttal to introduce new evidence, court abused its discretion by failing to grant defendant even a short continuance to present evidence in surrebuttal when it may have affected the result].) While the declaration was only relevant to show one of several material omissions supporting count 6, it was highly damaging to defendant's overall credibility. We agree with defendant that it would have been futile to accept the trial court's belated offer to testify in the middle of the prosecutor's closing argument once he had been labeled a perjurer.

Nonetheless, considering this error by itself, defendant was not otherwise prejudiced by his inability to refute the declaration. Notably, when shown an unsigned version of the declaration during cross-examination, defendant testified he did not recall ever seeing the document before. He indicates that his testimony on surrebuttal would have shown that he learned about the true extent of Lambdin's financial difficulties in February "1996," rather than in February "1995," as stated in the declaration. However, such testimony still would have been inconsistent with defendant's earlier testimony that the developer stopped making interest payments by June 1995 and then disclosed the dire nature of the project's financial status to him in December

1995. At best, he might have succeeded in lessening the declaration's impact on his credibility. But it is doubtful he would have eliminated it altogether.

### 3. *Cumulative Effect of the Errors*

■ In the instances of both errors, a brief continuance would have eliminated the possibility of any prejudice. Instead, the trial court insisted on rigidly adhering to the trial schedule to the detriment of defendant's right to a fair trial. This was error and a patent abuse of discretion. ■ " '[T]he trial judge "has the responsibility for safeguarding both the rights of the accused and the interest of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial." [Citation.]' " (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1387 [52 Cal.Rptr.2d 422].) ■ Simply put, the trial court's duty to conduct judicial business efficiently cannot trump defendant's right to present his defense in a manner he desires, particularly where accommodating him in the two instances here would have had only a slight impact on efficiency.

Defendant arguably would not have testified absent the first error and the declaration offered as impeachment evidence would not have been admitted. We therefore conclude the combined effect of the two errors substantially impaired his constitutional right to a fair trial. The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349 [234 Cal.Rptr. 442].) Under the facts here, there is a reasonable probability the jury would have reached a verdict more favorable to defendant in the absence of both errors.

### *The Verdicts Are Supported by Substantial Evidence*

■ In his opening brief, defendant contends his convictions are not supported by substantial evidence. He backs away from this contention in his reply brief arguing that he was simply trying to show that the evidence was not overwhelming and, when viewed with the other errors alleged on appeal, "the case was precarious as to [his] guilt." The Attorney General incorrectly contends defendant waived any issue as to the sufficiency of the evidence by failing to move for acquittal after the prosecutor rested. Nonetheless, defendant's claim fails on the merits.

■ "In assessing a sufficiency-of-evidence argument on appeal, we review the entire record in the light most favorable to the prevailing party to

determine whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Wader* (1993) 5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80]; see also *People v. Meza* (1995) 38 Cal.App.4th 1741, 1745 [45 Cal.Rptr.2d 844].) ▇▇ In this case, there is substantial evidence to support defendant's conviction on all counts.

It was undisputed the securities at issue in the case were not qualified. Defendant failed to raise a reasonable doubt that the securities were not exempt from the qualification requirement. (Corp. Code, §§ 25110, 25102, subd. (f); see also *People v. Simon* (1995) 9 Cal.4th 493, 499-500 [37 Cal.Rptr.2d 278, 886 P.2d 1271].) His convictions on counts 1 through 5 show the jury found credible Mrs. Gardner's testimony that Smith could not balance a checkbook and was not a sophisticated investor. Consequently, the securities were subject to the qualification requirement.

The evidence was also more than sufficient to show defendant intentionally made material omissions when he told Smith about the various investment opportunities. (Corp. Code, § 25401.) There was evidence to support a finding defendant knew the Lambdin investment was no longer generating a return before he invested Smith's money in that project. Evidence also existed to show he failed to explain to her that she would be substituting for another investor who wanted out of that investment. In addition, defendant admitted he did not disclose the amount of his fee to Smith.

Likewise, there was substantial evidence to show he committed grand theft by willfully and unlawfully taking property from Smith in excess of $400, either under the theory of false pretenses or embezzlement. (Pen. Code, §§ 487, 664.) Thus, he cannot complain that the jury chose to find him guilty of attempted grand theft. (See *People v. Lowen* (1895) 109 Cal. 381, 384 [42 P. 32] ["commission of burglary implies an attempt to commit it"]; *People v. McConnell* (1927) 80 Cal.App. 789, 792 [252 P. 1068] [conviction on attempted burglary upheld where evidence sufficient to support verdict of burglary].) ▇▇ Grand theft " 'includes larceny, embezzlement, larceny by trick, and theft by false pretenses. [Citations, fn. omitted.] Larceny, larceny by trick, and embezzlement involve taking another's personal property from the owner's possession, without the owner's consent, with the intent to deprive the owner permanently of the property. [Citations.] Theft by false pretenses does not require that the defendant take the property; it requires that the defendant use false pretenses to induce the other to give the property to him. [Citation.]' [Citation.]" (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1445-1446 [97 Cal.Rptr.2d 684].) "Corroborative evidence [of false pretenses] may be found in the defendant's declarations to other persons.

[Citation.]" (*Id.* at p. 1442.) In addition, a finding by the jury that the money was originally obtained in good faith and that defendant later developed a design to appropriate the money for his own use would support his conviction under the theory of embezzlement. (*People v. Woolson* (1960 181 Cal.App.2d 657, 671 [5 Cal.Rptr. 766]; *People v. McManus* (1960) 180 Cal.App.2d 19, 39 [4 Cal.Rptr. 642].)

The evidence showed investor funds were commingled in the Creative Investments account and that defendant only invested approximately 53 percent of the funds and withdrew 30 percent for his own use; the remaining funds were used to make interest or return of principal payments to investors. While he denied taking investor money for his own use, account transactions showed he withdrew over $65,000 from Creative Investments to help pay for a new house and, on other occasions, he or his wife withdrew funds for personal use. Defendant explained that he kept $300,000 in cash in a safe at his home and periodically used those funds to pay investors, and he estimated he had returned $600,000 of principal to investors from his own earnings and cash on hand. Two of the investors confirmed they had been repaid in full; four other investors confirmed they had been repaid a substantial portion of their principal. However, "[a]n intent to deprive the rightful owner of possession even temporarily is sufficient and it is no defense that the perpetrator intended to restore the property . . . . [Citations.]" (*In re Basinger* (1988) 45 Cal.3d 1348, 1363 [249 Cal.Rptr. 110, 756 P.2d 833].)

DISPOSITION

The judgment is reversed, and the case is remanded for a new trial.

Sills, P. J., and Moore, J., concurred.