[Crim. No. 1836. Fourth Dist. Mar. 25, 1963.]

THE PEOPLE, Plaintiff and Appellant, v. THOMAS J. RUSSEL, Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Appellant.

John F. O'Laughlin for Defendant and Appellant.

GRIFFIN, P. J.—Defendant-appellant was charged in count one of the crime of forgery, in violation of Penal Code, section 470, in that he forged the name of Robert G. Anaya to a "request for transcript of record" with intent to defraud Mr. Anaya and San Diego State College. Count two was dismissed. Count three charged forgery of a "receipt for transcript of record." Count four charged violation of Penal Code, section 529, subdivision 2 (false personation of another, to wit, Robert G. Anaya).

Defendant suffered a conviction by a jury on counts one, three, and four. Defendant's motion for new trial on the forgery counts was denied and the court granted the motion for a new trial on count four. Without pronouncing judgment, defendant was granted five years' probation conditioned, among other things, upon his paying a $1,000 fine and a $50 penalty. Defendant appeals from the judgment and the People appeal from the order granting defendant a new trial on count four. It is conceded by the People that if the judgment is affirmed as to defendant's appeal, the plaintiff's appeal may be dismissed.

There is little dispute about the facts. On May 22, 1961, defendant came to the door of the registrar's office at San Diego State College. Mrs. Danielson, a supervising clerk, asked what he wanted. Defendant had a transcript request form (People's exhibit one) in his hand, which he had previously obtained from one of the clerks. He asked if he could leave it. He was told that the office was closed and he asked if he could just leave it with her. She indicated that she could not take care of it then, but she had him complete the form. She asked if he had had a transcript made up before, as there was no fee for the first one, but he didn't know and seemed to be confused. She became suspicious because of his confusion over this, since students usually know about their

transcript requests. He said that he did not know if one had been sent to him. He said Robert Anaya was his brother-in-law and this intensified Mrs. Danielson's suspicions, because she had assumed defendant to be Robert Anaya. Defendant signed the form, at her request, "Brought in by brother-in-law" and signed with a purported signature. Supposedly, Robert Anaya had signed the form the night before, according to defendant's statement. Mrs. Danielson took the request form, as thus prepared by defendant, and he left. She checked the telephone directory and found that the address and telephone number given on the transcript request form were not correct. She looked at Mr. Anaya's picture in a personnel folder and it was not a picture of the man who had presented the form.

A Margaret Gilbert was the registrar at the college. On Tuesday, May 23, after Mrs. Danielson had shown her an application, Mrs. Gilbert called BR 8-5124, identified herself as representing the state college, and saying that she was calling about a transcript request. A male voice answered and there was some hesitancy at the other end of the line. The voice then said he was still there and moving to an extension telephone. He then said, "This is Robert Anaya." Mrs. Gilbert asked him to come to the college to pay a fee. Subsequently, she received a money order for $1.00 but she did not send out the transcript. On Friday, June 9, a telephone call came from a person identifying himself as Robert Anaya. He indicated that he had requested the transcript some time before and he made some derogatory remarks about the type of service and the employees at the college. Mrs. Gilbert asked him if he could come to the office, and he said he was employed. Mrs. Gilbert then offered to wait until he could get there after hours, and he agreed to this. He appeared about 5 p.m. on Monday, June 12. Mrs. Gilbert had previously notified the San Diego Police Department concerning the call, and on Monday, June 12, the officers positioned themselves nearby. Defendant arrived and said, "You told me I could pick up my transcript." Mrs. Gilbert said, "Who are you?" Defendant replied, "I am Robert Anaya." Mrs. Gilbert picked up a receipt form (People's exhibit two) that had been typed up in preparation for the meeting, and which form was then being used by other applicants. She asked him to print and sign his name. He printed "Robert George Anaya" and signed "Robert Anaya." He was asked to produce some identification to prove that he was Robert Anaya and he said

that he had none. About this time, the police entered. People's exhibit one was described as a form used at the college, called a "request for transcript of record." It was testified that these are not available at the window, but must be requested. The form provides space for the use of the former student and for the office. The college requires this release form, or an appropriate substitute. People's exhibit two was a receipt for a transcript form that was used when the student picked up the transcript at the window. As a final form, this was placed in use on June 12. It was as a result of defendant's call on June 9 that it was decided that such a form was necessary. It was felt that written evidence of identity would be helpful. On the morning of June 12, Mrs. Gilbert had a supply of the forms reproduced. Defendant was not the first person to use the form. It was used all that day. The form indicates that a transcript was prepared and provides a signature line next to the words "received by." It was testified that in general the college feels it should not release a student's record, and it follows the rule that his permission must first be given. The police asked defendant why he was signing the name "Anaya" when he knew he was not Anaya. The defendant said that he was obtaining the transcript for a man known to him as "Bob." He did not know Bob's full name, but had met him at the unemployment office on the preceding Thursday. Defendant related that he had been out of work for a considerable period of time, was desperate, needed money, and had been offered $50 by Bob to obtain the transcript. Defendant said that he knew it was wrong to obtain it and that Bob had no legal right to the transcript, but that he, defendant, was desperate and needed money. He said that Bob was to meet him on the parking lot and that he (Bob) had a black 1941 Ford. Defendant pointed out a lot a considerable distance west of the administration building. There was no such car in that area. On the way to the police station, defendant kept denying that he had a car of his own, and he denied having been convicted of a felony. Defendant declined to write out his story for the police, said that he had no educational background except limited high school education, and indicated that he had no need for the transcript.

Defendant had been seen to drive up to the college alone in a brand new gray Thunderbird. The police subsequently checked the car and it showed a registration of Thomas J. Russel. The police questioned him again. He admitted driv-

ing the Thunderbird there and said that he had been reluctant to say so because he had not worked since the preceding December and was in arrears on the car payments and that G.M.A.C. was looking for the car to repossess it.

Robert G. Anaya testified that he graduated from San Diego State College in 1957, with distinction in business management due to the excellence of his grades; that since his graduation, apart from two weeks with the city, he had been employed with the state; that his residence was at 2239 Finch Lane, and not at 3133 Admiral Avenue as placed on the application. Mr. Anaya did not know the defendant nor did he give him permission to use his signature, and he gave no one permission to sign his name to documents at San Diego State College concerning the securing of transcripts. The address and telephone number appearing on the request for transcript of record were not his, but the birth date was correct. He said he did not have a brother-in-law by the name of C. Anaya and that he did not present the document to obtain a transcript. He was shown the receipt for transcript and said that he in no way took part in filling it out; that the signature thereon was not his and that he gave no one permission to fill it out or to use his name; that he did not send the money order nor did he give anyone permission to do so; that he did not authorize anyone to obtain his transcript in 1961, nor did he authorize San Diego State College to give it to anyone; and that when he was told that someone had requested his transcript he went to the police department.

In defense, defendant testified that he was 30 years of age; that he resided at 2447 Mammoth Drive in San Diego; that it had always been his desire to write and that he had written a novel and submitted it to a number of publishers but it had been rejected; that he was interested in writing an exposé, a short magazine article on the subject of cheating. The article was entitled "Are Your Credits Safe?" He offered this article in evidence. He said that he contacted San Diego State College in the latter part of May to obtain a transcript, and he felt that the universities and colleges had no security system and that he could procure information from them, even on the telephone, about individuals' transcripts; that Anaya's name was given to him over the telephone by a female voice from the state college; that he got a blank request for a transcript form, filled it out and took it to the college, had a conversation with Mrs. Gilbert and on June 12 drove to the state college in his car, which he said he purchased outright,

paying over $3,000 for it; that he had previously sent in the form and one dollar for the transcript, feeling that it would be mailed to him; that on June 12 he did not intend to commit forgery, but was merely completing the research on his article. He said that he may have told certain people that he was born on October 18, 1929, the same date Anaya was born, but that in fact he was born on December 30, 1930. He described how he obtained Anaya's name and said that a Japanese name had stuck in his mind so he called the state college saying that he was trying to find this person. The person answering the telephone recited a list of names, and when he heard Anaya's, he asked for and was given the full name and birth date; that he filled out People's exhibit one and signed it ''Robert G. Anaya'' under the title ''signature of student''; that he did not intend to impersonate anyone and did not intend to give the impression that he was C. Anaya; that he came in after hours the first time because he happened to be in that area and didn't stop to think about their hours; that he came after hours the second time because Mrs. Gilbert insisted. He said that he owned the property at 3133 Admiral Avenue at the time, but that he did not live there; that he could think of no particular reason for using this address on the form and money order envelope; that he did give the police the story about Bob and did not tell them he wanted the transcript as research material for an article. He said that he thought if he fabricated a story he would succeed in convincing them and they would let him go. He admitted the two prior felony convictions.

On this appeal, defendant advances the argument that (1) the receipt and request for transcript are not written instruments and are not the subject of forgery, and (2) that the deputy district attorney committed misconduct.

As above shown, there is no question as to the false making of either the request or the receipt documents. The issue presented here is whether either of these documents may be a written instrument, the subject of the crime of forgery. In *People* v. *Brown,* 101 Cal.App.2d 740, 742 [226 P.2d 647], it was said that adding fictitious names to an initiative petition would have the effect of defrauding those who acted upon it as genuine. In *People* v. *Searcy,* 199 Cal.App.2d 740, 743 [18 Cal.Rptr. 779], it was stated that the fact that gasoline credit cards were not known when Penal Code, section 470, was last amended, does not prevent application of the section to cover forgery of a credit sales slip, and that the forms of

forgery set forth in Penal Code, section 470, are not exclusive.

Perkins on Criminal Law (Foundation Press 1957) at pages 292-295, states that the example of drawing a false university diploma is a forgery and that an officer of the university could be subjected to dismissal as a result of the forgery, and that the false drawing of a letter of recommendation (a forgery) could be the subject of forgery. Based upon this principle, the forging of the request and receipt, made for the purpose of securing the transcript, might well result in a possible dismissal of some authority in issuing the transcript to one not authorized to receive it and negligent release of the transcript might well subject the school to suit by Mr. Anaya for a violation of his right of privacy. This would particularly be true if the forger intended to use the transcript in a way that would cause embarrassment, pecuniary loss or injury to the reputation of Mr. Anaya.

The pivotal question was whether defendant forged the documents with intent to defraud someone. If we follow the path of our own courts, the intent to defraud is well made out. In a limited sense, there is an intent to defraud the college of the transcript, for the college would not otherwise give it up to the forger. In a wider sense, the forger is violating the college rules that restrict the circulation of such transcripts. It is well settled that the fraud involved may be against the public. (Wharton's Criminal Law (12th ed.) Ruppenthal, § 708.) In *French* v. *United States*, 232 F.2d 736, 739, it was held that drawing a false name on a prescription tends to defraud the government, in that it frustrates the administration of the narcotic laws. Similarly, the fraud here injures the public because it has been determined that the best interests of society are served by not opening to the general public the grades achieved by individuals. *People* v. *Wong Sam*, 117 Cal. 29 [48 P. 972], relied upon by defendant, is factually distinguishable. The request and receipt do have legal significance and do have the possibilities of working some fraud.

Defendant argues that there was no actual fraud, and certainly no consummation of it. It has been held that fraud need not be completed. (*People* v. *Morgan*, 140 Cal. App.2d 796, 800 [296 P.2d 75].) It makes no difference that the college personnel had detected the fraud and would not be deceived. All that the statute requires is an intent to defraud. The record does not show the nefarious

purpose toward which the transcript would have been utilized. It is not difficult to speculate on its possible wrongful use. *In re Parker,* 57 Cal.App.2d 388 [134 P.2d 302], mentions the securing of employment under false pretenses as an example.

It is also urged that section 470 of the Penal Code does not specify the request or receipt herein as being the kind of writing necessary to constitute a crime of forgery. That section lists a great number of writing forms. Among them is a "receipt for money or property" and a "request for the payment of money, or the delivery of goods or chattels of any kind." The language appears sufficiently broad to encompass the documents involved here.

Defendant cites Government Code, section 1227, and claims that these records were, under law, open to the public. He also refers to Code of Civil Procedure, sections 1892 and 1893. These sections do not make public every state record apart from those specifically rendered confidential by statute. There remains a category of records in which the public as a whole has no interest. In 15 Ops. Cal. Atty. Gen. 164, 169, 171, the question was whether the State Department of Public Health could impose reasonable restrictions on the accessibility of vital records. It was said at page 169 that there was no specific provision for confidentiality of vital records. The view taken was that the department could restrict the indiscriminate exposure of vital records. See also 50 California Law Review 79. A person who attends a public school might be injured by the promiscuous circulation of his school records. There is certainly a reasonable basis for the college authorities to restrict the circulation of this information.

The question as to the intent to defraud being a necessary element was submitted to the jury and apparently the jury rejected defendant's testimony in this respect. The fact that there was a false making of these documents is admitted. Defendant said that he signed another person's name to them, and it is uncontradicted that he had no permission to do so. The only conceivable defense on the facts to a forgery charge is that he lacked an intent to defraud. Yet he certainly was trying to secure the transcript by means of misrepresentation. He was trying to defraud the public in its policy on holding the transcript confidential, and he may have had a larger design in mind for a fraudulent use of the transcript, particularly where he said he was selling it to Bob for $50. The fact that he admittedly told the police a

false story about why he wanted the transcript does not bolster his position.

The next question involves six complaints of claimed prejudicial misconduct on the part of the prosecutor. One pertained to a remark about the possession by defendant of credit cards with other persons' names on them. The cards were received in evidence to show that defendant may well have used a false name in applying for the transcript. Since defendant admitted using a false name in so applying, the issue was resolved and no prejudicial error resulted from the remark. (*People* v. *Gould,* 170 Cal.App.2d 489, 492 [338 P.2d 938].)

Next, it is claimed that the prosecutor held a prison record of defendant in his hand and walked up to the defendant to question him about his correct birth date. It is argued that the jury may have seen and known what the record was about and observed it as he went by the jurors. There is no showing that the jurors knew of its contents. If they did, defendant admitted his prior convictions and no apparent harm was done in the minds of the jurors. Other complaints involved shuffling of papers on the prosecutor's desk and asking questions of defendant which defendant described as badgering the witness. The questions propounded do not substantiate the accusation. The claim that the prosecutor's reference, in his argument, to defendant's crime in Kansas, constituted prejudicial error is not meritorious. The prosecutor properly stated that the jury could consider his previous convictions of a felony in determining his credibility. He was about to say that there was another reason and that was: ". . . the crime itself, the one in Kansas, in 1949." Objection was made, and, after discussing the subject matter out of the presence of the jury, the court said that it was in evidence as to the character of the crime committed and no further reference was made thereto, except to tell the jury that it had no right to convict defendant on his past, but it had the right to take that into account in determining whether to believe his testimony. No prejudicial error resulted. (*People* v. *Aquilante,* 208 Cal.App.2d 530, 536 [25 Cal. Rptr. 344].)

Lastly, defendant complains because the deputy district attorney made some reference to a minister sitting with defendant and his wife, and that a small baby was also allowed to sit with them. The prosecutor referred to the occasion as a "smoke screen" of sympathy to bring in a "man of the cloth" to sit with defendant and his wife during

the trial. Objection was made. The court remarked that he did not know who brought the clergyman there. In chambers, counsel for defendant did not deny the presence of the minister and the baby, as indicated, but he disclaimed any knowledge on his part that the minister and child were being brought to the court and said that he did not approve of the occurrence. The baby, in charge of a third person, was removed from the courtroom. The trial proceeded and counsel for plaintiff stated that he did not want the jury to be controlled by sympathy but only by the evidence. The scene, no doubt, prompted the remark, and we see no prejudicial error affecting this defendant, since the picture presented was probably the result of defendant's efforts, or at least was done with his consent.

Judgment affirmed. Appeal of plaintiff dismissed.

Coughlin, J., and Brown, (G.) J., concurred.