[Crim. No. 6378. First Dist., Div. One. Aug. 5, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH KAGAN, Defendant and Appellant.

Marvin D. Heileson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Michael Buzzell, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, P. J.—On this appeal from a judgment of conviction for grand theft (Pen. Code, § 487) and forgery (Pen. Code, § 470), defendant makes six separate contentions which we shall discuss separately with the relevant details of the record after setting forth the facts surrounding the alleged criminal conduct.

## Facts

In July 1965, defendant, accompanied by his attorney William Berger, approached Miss Charlotte Shaber, president of National Business Factors, a firm engaged in factoring accounts receivable, credit reporting and collections, with a business proposition as follows: Defendant represented that he had contacts in Pakistan which made it possible for him to purchase T-shirts cheaply; that he already had approximately $14,000 worth of invoices from retailers and distributors for the purchase of such T-shirts; but that the Pakistani manufacturer would ship only on a letter of credit. Accordingly, defendant represented to Miss Shaber that if her firm would supply the funds to purchase a letter of credit, there would be a constant flow of additional invoices which Miss Shaber could purchase at a discount. Defendant showed various invoices to Miss Shaber, agreeing to give her time to investigate these invoices and also agreeing to furnish her with a financial statement.

Several days later, Miss Shaber having confirmed the genuineness of most of the invoices, defendant brought to her office a financial statement which he stated was inadequate. At this time Miss Shaber suggested the use of an irrevocable letter of credit, but defendant objected to this method, stating that he did not wish to disclose the name of the Pakistani manufacturer for fear that his buyers would import T-shirts directly. After some discussion the parties agreed that defendant's bank, Crocker-Citizens National Bank, would handle the letter of credit and would furnish a letter stating that should the credit not be utilized, the funds would be returned to Mr. Berger as trustee.

Accordingly, on July 23, 1965, defendant and Mr. Berger brought Miss Shaber a letter from defendant's bank and a letter from Mr. Berger acknowledging his contingent fiduciary relationship with Miss Shaber. Miss Shaber issued a check in the amount of $11,059.84 to Designed Trends, the fictitious name under which defendant was doing business, and the parties signed a factoring agreement whereby, basically, Miss Shaber's firm agreed to purchase invoices from defendant for

80 percent of their face value, plus percentages of payments received, calculated on a sliding scale.

The following day defendant took Miss Shaber's check to the Mill Valley Branch of the Crocker-Citizens National Bank, using the check to open an account in the name of Designed Trends. Almost immediately thereafter he withdrew $550 from the Designed Trends' account and deposited said sum to his personal account at the same bank, which account was overdrawn at the time of this deposit. On July 27, 1965, defendant purchased from the Crocker-Citizens National Bank a letter of credit in the amount of $8,668, with the beneficiary being Shish Mahal Hosiery Limited in Lahore, West Pakistan. A copy of this letter with the amount and the name of the Pakistani manufacturer cut out of it was subsequently delivered to Miss Shaber by Mr. Berger. However, upon Miss Shaber's request, she was furnished a copy showing the amount of credit, and, at that time defendant explained that the difference between the amount of Miss Shaber's check and the amount of the letter of credit was due to such expenses as shipping and docking charges.

On August 12, 1965, defendant and Mr. Berger brought Miss Shaber more purchase orders to factor. Miss Shaber asked the status of the prior transaction, having received no notification of it, and defendant replied that certain amendments relating to the manufacture of the T-shirts had been effected. After confirming the additional purchase orders, Miss Shaber advanced defendant $23,768.80 pursuant to the factoring agreement. Subsequently, however, she stopped payment on the check since she had no proof of delivery of the goods under the first set of invoices factored. Defendant and Mr. Berger threatened suit, and eventually the parties compromised and Miss Shaber advanced defendant a check for $11,680 made out to Designed Trends.

On August 18, 1965, defendant deposited a cashier's check for $11,680 to the Designed Trends' account. The next day he made a number of withdrawals from this account, depositing the withdrawn funds into several of his business and personal accounts, all of which were overdrawn at the time of the deposit[1]

On September 2, 1965, defendant purchased a letter of credit in the amount of $1,000 from Crocker-Citizens National

[1]On several other occasions in August 1965 and thereafter, defendant transferred funds from the Designed Trends' account into his personal and business accounts, in each case the account into which the transfer was made being overdrawn at the time of deposit.

Bank. This letter, which again named Shish Mahal Hosiery Limited, as beneficiary, showed an order for 5,000 dozen T-shirts at 20 cents a dozen. Thereafter Mr. Berger delivered to Miss Shaber a photocopy of a letter of credit, this document showing the amount of the letter of credit as $10,000 and the price per dozen of the T-shirts as $2.00. (Defendant obtained this document by photocopying the letter of credit, which he in fact procured, altering this photocopy, and photocopying the altered photocopy.) Once again, defendant told Miss Shaber that the discrepancy between the funds she had advanced and the purported amount of the letter of credit was due to docking costs.

On September 24, 1965, after Miss Shaber had tried unsuccessfully to contact defendant, defendant brought her a check for $358.80 as payment on one of the smaller invoices. At this time defendant stated that the T-shirts had not arrived because of the Indian-Pakistan war. Miss Shaber then suggested that the letters of credit be cancelled and defendant stated that he had done so. He also suggested that the goods might be produced in Korea, but Miss Shaber stated that she wanted her money back.

Meanwhile, unbeknownst to Miss Shaber, defendant's Pakistani venture had failed. Accordingly, on September 22, 1965, the first letter of credit having expired unutilized, the issuing bank, at defendant's request, transmitted the money represented by this letter of credit into defendant's Designed Trends' account. The next day defendant gave Mrs. Marjorie Gary, who was in the import-export business and had worked with defendant on his Pakistani venture, a $7,500 cashier's check purchased with the funds in the Designed Trends' account and told her to purchase a $7,400 cashier's check and to keep $100 for herself. Accordingly, Mrs. Gary obtained a $7,400 cashier's check payable to defendant's wife, Elaine Kagan, who used the check to open a new account for Designed Trends at the Wells Fargo Bank. From this account Mrs. Kagan immediately withdrew $3,400 and less than two months later the balance of this account was reduced to $7.15.

On October 8, 1965, the funds from the second letter of credit, for $1,000, were returned to the Designed Trends' account at the Crocker-Citizens National Bank.

Ultimately Miss Shaber learned that the letters of credit had been cancelled and that the second letter was not for $10,000. However, when she demanded that defendant pay her the funds she had paid him in purchasing the invoices or she would go to the police, defendant told her not to worry, that

part of the money was solidly invested in Mexican limestone and that the balance had been paid to M. Gary Limited for 5,000 dozen T-shirts.[2] When defendant did not accede to Miss Shaber's demands for payment she complained to the district attorney and the instant prosecution resulted.

### Sufficiency of Evidence to Support Conviction of Forgery

Defendant contends that as a matter of law he cannot be convicted of forgery because, first, the photocopy of the altered photocopy was not itself altered, and second, because an altered copy of a letter of credit has no legal significance. In considering these contentions we first note the relevant provisions of Penal Code section 470,[3] defining the crime of forgery: "Every person who, with intent to defraud, . . . falsely makes, alters, forges, or counterfeits, any" of the writings specified in the section "is guilty of forgery."

Although a letter of credit is not one of the writings specifically mentioned in section 470, the forms of forgery set forth in the statute are not exclusive. (*People v. Searcy,* 199 Cal.App.2d 740, 743 [18 Cal.Rptr. 779, 90 A.L.R.2d 814] ; *People v. Russel,* 214 Cal.App.2d 445, 453 [29 Cal.Rptr. 562].) In *Searcy, supra,* it was held that the falsification of a sales slip in connection with the use of a stolen gasoline credit card constituted forgery, even though gasoline credit cards were not in existence when section 470 was last amended. The court, quoting from *People v. McKenna,* 11 Cal.2d 327, 332 [79 P.2d 1065], stated as follows: " 'The crime of forgery consists either in the false making or alteration of a document without authority or the uttering (making use) of such a document with intent to defraud. (§ 470, Pen. Code) Whether the forged instrument is one of a particular name or character or, if genuine, would create legal liability, is immaterial; the test is whether upon its face it will have the effect of defrauding one who acts upon it as genuine.' " (199 Cal.App.2d at p. 745.) Similarly, in *Russel, supra,* the court held that a falsified request and a false receipt for a college transcript constituted forgeries. In *People v. Wong Sam,* 117 Cal. 29, 30 [48 P. 972], however, a false letter pur-

---

[2]Mrs. Gary of M. Gary Limited falsely confirmed the fact of delivery to Miss Shaber; on the stand at trial Mrs. Gary admitted that she had done so at defendant's request and had also given him a false receipt of payment for delivery. In fact, no T-shirts from Pakistan were ever received other than samples.

[3]Unless otherwise indicated, all statutory references are to the Penal Code.

porting to have been written by another and intended to influence the collector of customs to reject the application of a Chinese subject to land in this country was held not to be a forgery.

The gist of the holdings in *Searcy* and *Russel* is that the forged writings had the effect of defrauding those who acted upon them as genuine. In the former, the rationale was that the slip constituted an implied promise to pay for the merchandise therein described; in the latter, that if the university had released the requested transcript it might have been held civilly liable for a violation of the right of privacy to the person whose transcript it really was, and also that the person issuing it might be subject to dismissal. Similarly, other cases in the area indicate that a document may be the subject of a forgery prosecution if it is of apparent legal efficacy and would, if genuine, be capable of affecting the personal or property rights of another. (See *People* v. *Di Ryana,* 8 Cal. App. 333, 336 [96 P. 919]; and see discussion in 1 Witkin, Cal. Crimes (1963) § 495, p. 452.)

In *People* v. *Wong Sam, supra,* 117 Cal. 29, 30, the rationale was that the false letter was not an instrument which could defraud anyone in the statutory sense but was merely an assault upon the veracity, reputation and business standing of the person against whom it was aimed.

Adverting to defendant's contentions in the light of these principles, we hold that the first contention that a photocopy of an altered photocopy cannot be a forged instrument is without merit. If this contention were correct, then a forger could always insulate himself from liability by photocopying his forged instrument in those cases where exhibition of the instrument or a copy thereof is an element of the forger's fraud. ▆▆ Since it is well established that the false making of an instrument with intent to defraud and without authority is a forgery (*People* v. *McKenna, supra,* 11 Cal.2d 327, 332; *People* v. *Hawkins,* 196 Cal.App.2d 832, 837 [17 Cal. Rptr. 66]; § 470), there can be no doubt that the alteration of a photocopy of an original instrument constitutes forgery when such alteration is done with intent to defraud and without authority. Nor can it be doubted that the reproduction of such a false instrument by photocopying it results in the making of another false instrument, which reproduction, if done with intent to defraud and without authority, likewise constitutes forgery.

▆▆ A criminal statute is to be viewed from the standpoint of a reasonable man who might be subject to its terms. (*Peo-*

*ple* v. *Sorensen*, 68 Cal.2d 280, 285 [66 Cal.Rptr. 7, 437 P.2d 495].) In the light of this rule we think it patent that a reasonable man who makes a false document and then without authority reproduces it by photocopying it with intent to defraud someone with the reproduction might expect to be convicted of forgery. ▮ Our inquiry, therefore, is directed to defendant's second contention, namely, that even though the photocopy of the letter of credit was in fact altered, the altered photocopy had no legal significance and therefore the alteration of such instrument did not constitute a forgery.

The People argue that the photocopy affected personal and property rights because it lulled Miss Shaber into refraining from investigating defendant's activities and also because it might have caused the bank to become liable to Miss Shaber for the full $10,000. The latter contention appears to be erroneous, however, inasmuch as the copy did not purport to be anything but a copy and accordingly even if genuine, i.e., a true photocopy, it could not have subjected the bank to any liability to anyone. On the other hand, we find merit in the former contention. It is clear that defendant's purpose in showing the copy to Miss Shaber was to lull her suspicions, and it is likewise clear that defendant achieved this object, at least temporarily.

Although the People have posed the immediate issue in terms of the effect of the subject photocopy upon Miss Shaber's personal and property rights, the pivotal question is whether defendant forged the original photocopy of the letter of credit with intent to defraud someone. The answer to this question is that the forged instrument did in fact have the effect of defrauding Miss Shaber, who acted upon it as genuine. It is clear that defendant, by virtue of the alteration of the original photocopy, intended that Miss Shaber believe that he had obtained a letter of credit for $10,000, the condition of her having given defendant a check for $11,680 on or about August 18, 1965 being that he purchase a letter of credit with these funds. She made repeated attempts to procure a copy of this letter of credit from defendant and it was not until after September 2, 1965 that she received the photocopy showing that the amount of the letter of credit was for $10,000. Although Miss Shaber was satisfied with the explanation for the discrepancy between $11,680 and $10,000, it is apparent that if she had known that the discrepancy was $10,680 rather than the represented $1,680, she would have been alerted that

658

an investigation and further inquiry were in order. A prompt investigation could have resulted in proceedings which would have reached the funds before they were dissipated by defendant. Under the circumstances there can be no doubt that the forgery of the photocopy of the letter of credit did have the effect of defrauding Miss Shaber, who acted upon the photocopy delivered to her as being genuine.

### Sufficiency of Evidence to Support Conviction of Grand Theft

Defendant argues that the evidence clearly shows that he cannot be guilty of any of the types of theft on which the jury was instructed: larceny by trick or device, embezzlement, or false pretenses. He further contends that if the evidence does not support a conviction under all three of these theories, even if it be sufficient as to one or two of the theories, then the conviction must be reversed because it is impossible to tell whether the jury verdict rests on a valid or an invalid theory.

We first point out that defendant is mistaken as to the latter contention. The cases that he cites for this proposition, such as *Stromberg* v. *California*, 283 U.S. 359 [75 L.Ed. 1117, 51 S.Ct. 532, 73 A.L.R. 1484] and *Shuttlesworth* v. *Birmingham* 382 U.S. 87 [15 L.Ed.2d 176, 86 S.Ct. 211] merely hold that a conviction must be reversed if it may be based on unconstitutional portions or an unconstitutional construction of a statute. ■ As to the California theft statute (§ 484), however, the cases all hold that a judgment of conviction must be affirmed if there is sufficient evidence to support a theft conviction on *any* theory. (See, e.g., *People* v. *Woolson,* 181 Cal.App.2d 657, 666 [5 Cal.Rptr. 766] ; *People* v. *McManus,* 180 Cal.App.2d 19, 31-32 [4 Cal.Rptr. 642] ; *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271].) As stated in *Ashley, supra,* ''Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved.'' (P. 258.)[4]

In this case, however, we think that the evidence could support a conviction of theft based on any of the three foregoing theories. First, as to larceny by trick or device, the elements of this offense are a taking of something belonging to another and an asportation of the thing taken with an intent per-

---

[4]Of course, if the evidence in a case patently did not apply to some theory of theft, it would be error, although not necessarily reversible error, for the court to give an instruction on that theory, since instructions not warranted by the evidence should not be given. (*People* v. *Jackson,* 42 Cal.2d 540, 546 [268 P.2d 6] ; *People* v. *Moore,* 43 Cal.2d 517, 530 [275 P.2d 485].)

manently to deprive the owner of his property. (*People* v. *Woolson, supra,* 181 Cal.App.2d 657, 668; *People* v. *Bartges,* 126 Cal.App.2d 763, 770 [273 P.2d 49].) If the taker of the property obtains title as well as possession, the crime is not larceny by trick; however, where money is given for a particular purpose and is not used for that purpose, title does not pass by reason of the fraud, and the crime is larceny by trick. (*People* v. *Woolson, supra,* at p. 668; *People* v. *Bartges, supra,* at p. 770.) ▇ Here the evidence is susceptible of the inference that Miss Shaber gave the money to defendant for a particular purpose, that is, to buy letters of credit, and that he never intended to do so but instead transferred most of the money into his personal accounts. Such evidence suffices to constitute larceny by trick.

Second, as to embezzlement, the gist of this offense is the appropriation to one's own use of property delivered for devotion to a particular purpose other than one's own enjoyment of it. (*People* v. *Parker,* 235 Cal.App.2d 100, 108-109 [44 Cal.Rptr. 909]; *People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38]; *People* v. *Darling,* 230 Cal.App.2d 615, 621 [41 Cal.Rptr. 219].) Although it is true, as defendant argues, that some sort of fiduciary relationship is necessary, and likewise true that if title passes to the taker then the crime is not embezzlement (*People* v. *Dougherty,* 143 Cal. 593, 594 [77 P. 466]; *People* v. *O'Brien,* 106 Cal. 104, 107 [39 P. 325]; *People* v. *Petrin,* 122 Cal.App.2d 578, 584 [265 P.2d 149]; *People* v. *Parker, supra,* at pp. 108-109; see also 1 Witkin, Cal. Crimes (1963) § 389, pp. 361-362), there is evidence in this case from which the jury might have inferred an entrustment of the funds to defendant. ▇ Since there was evidence from which it could be inferred that defendant was to use Miss Shaber's funds for purchasing letters of credit and for no other purpose, the inference could be drawn that defendant took these funds impressed with a trust. His diversion of the funds into his personal accounts would thus constitute embezzlement.

Third, as to theft by false pretenses, it must be shown that the defendant made a false representation or false promise with the intent to defraud the owner of his property, and that the owner was in fact defrauded in that he parted with his property in reliance upon the representation. (*People* v. *Ashley, supra,* 42 Cal.2d 246, 259; *Perry* v. *Superior Court,* 57 Cal.2d 276, 283 [19 Cal.Rptr. 1, 368 P.2d 529].) Where, as here, the alleged false pretense is testified to only by the com-

plaining witness, then there must be corroboration in the form of a written note or memorandum of the pretense, or alternatively, corroborating circumstances. (§ 1110.)

Defendant here argues that the evidence does not show any false representations at the time that defendant obtained Miss Shaber's funds; that the only promise to return the money was made by Mr. Berger; and that if there were any oral false pretenses there is no corroboration thereof, since the altered letter of credit did not accompany the alleged false pretenses but was forged later and therefore cannot be used in corroboration.

As discussed *supra,* there is evidence from which it could be inferred that defendant took Miss Shaber's funds subject to the condition that he use said funds to purchase letters of credit. It is also possible to infer from the same evidence that defendant represented that he would use the funds to obtain letters of credit, and that on the basis of these representations Miss Shaber parted with title to the funds. Further, since Mr. Berger, who did promise to return the funds, was defendant's attorney, it is possible to find an implied promise by defendant that he would return any unutilized funds from the letters of credit. Further, it is clear from Miss Shaber's testimony that she parted with her money on the basis of the representation that she would get her money back if the funds were not utilized. The elements of the crime of false pretenses are thus made out.

As to corroboration, it is true that the forged letter of credit was drafted after the misrepresentations. Section 1110, however, does not state that the note or memorandum of the pretense must accompany the pretense. The forged photocopy of the letter of credit was clearly a part of defendant's scheme to defraud Miss Shaber; it induced her to believe that the money had been used to buy a letter of credit according to their agreement. The latter is therefore corroborative of the making of the false promise (that defendant would purchase a letter of credit) and is also evidence of fraudulent intent. (See *People* v. *Pugh,* 137 Cal.App.2d 226, 234 [289 P.2d 826] ; *People* v. *Wynn,* 44 Cal.App.2d 723, 728-729 [112 P.2d 979].) Further, there are corroborating circumstances present in this case, such as Mrs. Gary's testimony that she lied to Miss Shaber on defendant's behalf.

In connection with his contention regarding sufficiency of the evidence, defendant also argues that there is insufficient evidence of fraudulent intent in this record, and further that the court erred in rejecting his offer of proof designed to show

lack of that intent. Basically, his offer of proof consisted of correspondence between Mrs. Gary, defendant, and Shish Mahal antedating defendant's transactions with Miss Shaber. Defendant offered this correspondence to show that there was a valid business deal in existence. ▮▮▮ In this connection, however, as defendant himself argues in stating that the record shows lack of criminal intent, there is testimony in the record that does show that the Pakistani manufacturer existed and that defendant made some attempts to import T-shirts. Further, the court, in ruling on the offer of proof, stated that if any of the letters related to deals involving Miss Shaber, those letters would be admissible. Under these circumstances the court did not err in excluding evidence of unrelated, noncontemporaneous transactions. With respect to fraudulent intent, the evidence already alluded to and going to this issue suffices to establish such intent.

### Instruction on the Grand Theft Count

Defendant contends that the prosecution should have been forced to elect which theory of grand theft it chose to proceed upon, and also that the court should have instructed that the jurors must unanimously agree on the type of theft committed in order to convict defendant. ▮▮▮ *People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897], explicitly rejects both these contentions and holds that there is no error in failing to instruct the jury that they must agree on the method by which the theft was committed. (Accord: *People* v. *Theodore,* 121 Cal.App.2d 17, 31 [262 P.2d 630]; *People* v. *Schmidt,* 147 Cal.App.2d 222, 230-231 [305 P.2d 215]; *People* v. *Hodges, supra,* 153 Cal.App.2d 788, 794.) It is sufficient if the instructions inform the jury that they must agree that the property was fraudulently appropriated by defendant. (*People* v. *Theodore, supra,* at p. 31.) As stated in *Nor Woods, supra,* "since by the verdict the jury determined that he [defendant] did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell." (At p. 586; see also *People* v. *Andary,* 120 Cal.App.2d 675, 682 [261 P.2d 791].) Here the court did instruct in essence that the jury had to find defendant guilty of grand theft beyond a reasonable doubt and to a moral certainty. Accordingly, its instructions were sufficient.

### Alleged Misconduct
### on the Part of the Trial Court

Defendant cites six specific instances of alleged misconduct on the part of the court, asserts that the court violated its

duty to be impartial, courteous and patient, and urges that this conduct constitutes reversible error. ▮▮▮ First, early in the trial the court permitted Miss Shaber to testify to the instructions she had received from her bank relative to the means of protecting her interests with letters of credit. Although the trial court recognized that this testimony was hearsay it held such testimony admissible to show Miss Shaber's state of mind in advancing funds to defendant.[5] Defendant claims that in making this ruling, the court indicated that it clearly viewed the case as one of embezzlement. There is no basis for this claim. The court's comment in admitting the hearsay evidence made no reference to or suggestion of the crime of embezzlement. Rather, the court merely stated that it was admitting this testimony in evidence as "filling out the picture" and that it was "not binding on the defendant."

▮▮▮ Second, defendant points out that towards the close of the trial, in chambers, the court improperly stated that the theory of the prosecution's case was embezzlement. The court merely stated, however, that embezzlement was a possibility; further, the remark was out of the jury's presence and so could not constitute misconduct, nor could it have been prejudicial.

▮▮▮ Third, when defense counsel was apparently trying to demonstrate on cross-examination that Miss Shaber had been guilty of a breach of contract (in putting a stop payment on one of her checks to defendant), the trial court limited cross-examination on the question of whether or not she had breached her obligation. Defendant argues that the court was in essence telling the jury that the terms of the factoring agreement were irrelevant. We do not think that the court's comments are susceptible of such a construction. Basically the court was trying to prevent defense counsel from spending time proving that Miss Shaber's check was not for a sum equal to 80 percent of the amount of the purchase orders. The court did not abuse its discretion here, inasmuch as Miss Shaber's civil liabilities to defendant, if any, are not relevant to the question of his guilt of grand theft.

Fourth, an incident occurred in chambers relating to the court's proposal to give CALJIC No. 30A, dealing with false statements as evidence of consciousness of guilt. In explaining the application of the instruction, the judge remarked that

---

[5]This ruling was correct and is not here challenged. (See *People* v. *Marsh*, 58 Cal.2d 732, 738 [26 Cal.Rptr. 300, 376 P.2d 300].)

when he was a young lawyer, he once lost some money when the borrower gambled it away in Reno rather than putting it to the specified use. Defendant argues that by virtue of this experience the judge was disqualified, just as a similar experience would have disqualified a juror, and also contends that the incident shows personal bias on the part of the judge against defendant. We do not agree with this contention.

The use of a personal experience to illustrate an application of the proposed instruction, made outside the presence of the jury, does not constitute an expression of personal prejudice against defendant. In any event, defense counsel did not object to the foregoing remark nor did he file an affidavit of bias and prejudice at that point in the trial. He therefore cannot claim on appeal that the trial judge was biased. (See *People* v. *Purta*, 259 Cal.App.2d 71, 75 [66 Cal.Rptr. 38], and cases there cited.)

Fifth, defendant refers to an altercation between defense counsel and the court that took place while defendant was making a motion for a new trial. This exchange, while reflecting upon the decorum of both court and counsel, does not indicate any prejudice on the part of the court against defendant, nor does the record disclose that the court did not give full consideration to defendant's motion for new trial.

Sixth, during the motion for mistrial (based upon the alleged "*Griffin* error" hereinafter discussed) defense counsel was arguing that the district attorney, during his argument to the jury, paused perceptibly after uttering the words "His refusal to say anything." The trial court then pointed out that when Mrs. Gary was testifying during the trial it had observed what it thought might be signaling between her and her attorney, but that it had refrained from bringing this fact up since it did not want to embarrass anybody. Defendant now argues that proper judicial discretion would have compelled bringing this signaling to the attention of the district attorney and defense counsel. We agree with this contention, but it seems clear that the court's failure to point out the signaling during the trial could not have prejudiced defendant. Defendant and Mrs. Gary had been closely associated in business and Mrs. Gary had lied for him. To call attention to the signaling on her part during the trial might indeed have embarassed defendant. In any event, the court appeared to have been satisfied with the explanation given by Mrs. Gary's attorney at the mistrial proceedings that in fact there was no signaling. Moreover, no affidavit of bias and

prejudice was filed by defendant, nor was there any request by him that another judge hear the mistrial proceedings.

In sum, the record discloses that the trial judge conducted himself fairly and impartially in the presence of the jury and in making all of his rulings. There is no misconduct embodied in any of the isolated comments cited by defendant and occurring before the motion for new trial. The unfortunate instances of indecorum on the part of the trial judge occurred after the trial and could not have prejudiced defendant's trial. We note, moreover, that the trial judge instructed the jury that they were to disregard any statements he might have made that gave any indication as to what facts they should find or what witnesses they should believe or disbelieve. This instruction cured any error that might be inherent in any of the court's comments during the trial. (*Miller* v. *Western Pac. R.R. Co.*, 207 Cal.App.2d 581, 607 [24 Cal.Rptr. 785]; *Howarth* v. *Maroney*, 228 Cal.App.2d 116, 123-124 [39 Cal.Rptr. 260].)

### The Rule of Griffin v. California

During his closing argument to the jury the district attorney made certain remarks which we set out in the footnote.[6] These remarks contain the following statement referring to defendant: ". . . his refusal to say anything when he is confronted with the truth, . . ." Defense counsel contended on his motion for a mistrial, made while the jury was deliberating, that the district attorney paused perceptibly after the phrase "his refusal to say anything" and that this pause constituted an evasion of the rule of *Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] prohibiting comment on the failure of the defendant to testify.

The subject statement apparently had reference to the testimony of Miss Shaber that after she found out about the letters of credit, she met with defendant and his wife in his office, at which time defendant told her that everything would be all right, that part of the money was solidly invested in

---

[6] "All I say, Ladies and Gentlemen, is to look at the circumstances, remember the altered letter of credit, remember the delay in purchasing it, remember his failure to buy the shirts, his failure to return the money, the transferring of the funds to the various accounts when those accounts were overdrawn, his refusal to say anything when he is confronted with the truth, telling Miss Gary to lie to Shaber, having Miss Gary prepare and put paid on that fictitious invoice, telling Shaber, Miss Shaber on the 24th that, oh, yes, he was cancelling when he already had the money and he even had some of it right in his pocket, and all of the lies showing a consciousness of guilt, all of these things together, all of those matters that I have just stated, Ladies and Gentlemen, the People feel go to the question of intent. . . ."

Mexican limestone, and that the balance had been paid for 5,000 dozen T-shirts. Defense counsel did not object to that testimony; neither did he object to the district attorney's comment on that testimony nor request that the jury be admonished on this score. The only objection made was at the motion for mistrial, this objection being directed not to Miss Shaber's testimony but solely to the alleged pause in the prosecutor's argument when he alluded to this testimony.

At the hearing of the motion for a mistrial three witnesses testified that they had noticed the pause. The trial court observed, however, that it did not notice such a pause and denied the motion upon that basis. We are not in a position on this appeal to question the trial court's resolution of the factual issue as to whether the district attorney did pause improperly in his argument in a manner tantamount to a comment on defendant's failure to testify. Rather we must accept the trial court's conclusion in this regard. Accordingly, we conclude that there has been no violation of *Griffin* in this case.[7]

## The Sentencing Proceeding

At the time of the pronouncement of judgment the trial court ordered that execution of the sentence on the grand theft conviction (count 1) be stayed pending appeal on the forgery conviction (count 2), and that when the forgery conviction became final, the stay of execution on the grand theft conviction would become permanent. The judgment, however, states that execution of the sentence on the grand theft conviction is stayed pending any appeal and during service of any sentence the Adult Authority pronounces in connection with the forgery conviction, and that at the completion of service of the sentence for the latter conviction, the stay was to become permanent. Defendant argues that the pronouncement of judgment controls and that the procedure used there to avoid double punishment is invalid. He also contends that even if the procedure specified in the judgment controls, that method is also invalid since it improperly suspends execution of sentence.[8]

---

[7]It should be here noted that the court gave the cautionary instruction that no inference of guilt might be drawn from the fact that defendant did not testify on his own behalf.

[8]Defendant also contended in his brief that the effect of this procedure is that should the forgery conviction be reversed on appeal he would be resentenced for grand theft and would not get credit for time already served on the forgery count. Since we are affirming the conviction on the forgery count, this contention is rendered moot.

The judgment is controlling. The sentencing court did not exhaust its jurisdiction by simply pronouncing judgment but was empowered to thereafter vacate, add to or modify the sentence if it was based on a mistake of fact or law, provided, that the pronouncement of judgment was not entered in the minutes and execution had not begun. (*People* v. *Thomas*, 52 Cal.2d 521, 533-535 [342 P.2d 889]; see *People* v. *Hensel*, 233 Cal.App.2d 834, 837 [43 Cal.Rptr. 865].) In this case there is no showing or contention that execution of sentence occurred between the pronouncement of judgment and the modification thereof; nor does the modification increase the sentence, or adversely affect defendant, as was the case in *In re Bateman*, 94 Cal.App. 639 [271 P. 757], relied upon by defendant. Therefore, even if we were to assume that the sentencing procedure used in the oral pronouncement of judgment was invalid because it failed to suspend imposition of sentence on the grand theft conviction until completion of the sentence for forgery (see *People* v. *Gomez*, 252 Cal.App.2d 844, 860-861 [60 Cal.Rptr. 881]), we must look to the modification of that pronouncement as it appears in the judgment.

 The sentencing procedure used in the judgment is the same as that approved in *People* v. *Niles*, 227 Cal.App.2d 749, 756 [39 Cal.Rptr. 11]. That procedure was questioned in *People* v. *Hernandez*, 242 Cal.App.2d 351, 359, fn. 1 [51 Cal. Rptr. 385], on the same grounds as defendant raises here, namely, that the court has no power to suspend the execution of sentence except as an incident of granting probation. (Relying on such cases as *Oster* v. *Municipal Court*, 45 Cal.2d 134, 139 [287 P.2d 755]; *People* v. *Atwood*, 221 Cal.App.2d 216, 220 [34 Cal.Rptr. 361].) However, the case of *In re Wright*, 65 Cal.2d 650, 655-656, fn. 4 [56 Cal.Rptr. 110, 422 P.2d 998], discusses the foregoing objection and concludes that it does not have merit and that the procedure used in the *Niles* case is proper and does not violate the spirit of section 654 proscribing double punishment. Accordingly, we are bound to approve the procedure used.

The judgment is affirmed.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied August 28, 1968, and appellant's petition for a hearing by the Supreme Court was denied October 3, 1968.