Filed 5/8/25  P. v. Seremak CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081967 |
| v. | (Super.Ct.No. RIF1903186) |
| WILLIAM WAYNE SEREMAK, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Davis, Judge.

Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant William W. Seremak on two counts of making criminal threats against his wife and two counts of violating a restraining order protecting her. On appeal he makes several arguments about the admission and exclusion of evidence. We find no error and affirm the judgment.

FACTS

Seremak and his wife began dating and moved in together in 2015, and they married in 2016. According to Seremak's wife, his behavior towards her became increasingly manipulative and abusive over time. In May 2019, she sought and obtained a temporary restraining order against him, and in June 2019 she was granted a permanent restraining order. As of June 2023, when Seremak's trial was held, they had a six-year-old daughter together and divorce proceedings were pending.

According to the prosecution, Seremak's abusive behavior included several criminal offenses. Seremak was charged with a total of five counts, each listing his wife as the victim, including one count of inflicting corporal injury resulting in a traumatic condition (Pen. Code[1], § 273.5, subd. (a), count 1), two counts of making a criminal threat (§ 422, counts 2 and 3), and two misdemeanor counts of violating a restraining

---

[1] Undesignated statutory references are to the Penal Code.

2

order (§ 273.6, subd. (a), counts 4 and 5).[2]  We will discuss each of these charges separately, in chronological order.

Count 3: On May 16, 2018, Seremak and his wife argued.  His wife testified he told her he was going to kill her if she did not leave.  She took their daughter and left to stay at a hotel for the night.  He then sent her a series of text messages promising to kill her if she returned.[3]  The next day, however, he sent several more text messages demanding she come home, which she did.

Count 1: On April 2, 2019, Seremak became upset with his wife while they were in bed, along with their daughter, getting ready to go to sleep.  His wife testified Seremak struck her hard with his elbow about three times, causing a bruise.  A photograph of the bruise was shown to the jury.

Count 2: On May 19, 2019, Seremak became upset with his wife and began yelling at her.  She testified he threatened to "take all of us out," which she understood to mean not only her, but also her mother, father, and daughter.

---

[2]  The final information, filed in February 2023, consolidated allegations from several criminal complaints, the first of which dates to May 2019, and which apparently remained pending because of delays related to the COVID-19 pandemic.

[3]  One of Seremak's texts told his wife "Do not come home tonight or I will murder you.  I promise you."  She responded by asking him to "calm down so we can work it out."  Seremak responded "I don't want to work this out.  I want you dead."  Seremak also texted her "you step foot in this house and I will kill you.  You will never get within 100 feet of me again or you will die" and "You can never come home you psycho bitch.  You destroyed all our lives with your seven-year-old character.  Never." . . ."I expect you to die and go to hell where you belong."

Count 4: After the incident alleged as count 2, Seremak's wife retained a lawyer and, on May 21, 2019, she obtained a temporary restraining order requiring Seremak to move out of the house immediately and to have no contact with her. Seremak was served with the restraining order the next day. Within hours, however, he began texting and calling her. When he said he would come back to the house, she left with their daughter. She soon returned and saw his car parked outside. She called police from a nearby store parking lot. A police officer collected the text messages as evidence. The officer also spoke to Seremak by phone. Seremak admitted he knew about the restraining order, said he understood it, and acknowledged violating it.

Count 5: After a hearing on June 20, 2019, the trial court granted Seremak's wife a permanent restraining order, requiring Seremak to move out and to have no contact with her for three years. Seremak was present for the hearing and was advised by the court of the restraining order's terms. Nevertheless, on the same day, he sent his wife a series of text messages. His wife called police, who collected the text messages as evidence. Police also spoke to Seremak, who admitted violating the restraining order.

Seremak testified in his defense. He denied elbowing or otherwise physically abusing his wife. He said she verbally and physically abused him. Her physical abuse of him was primarily "punching," and he also described one incident where she "kicked the hell out of" him: "I was laying on the floor playing with my daughter, and she came up without saying a word and started kicking me as hard as she could." Seremak acknowledged that "at the very end" of their relationship he said abusive things to her in

4

response.  He said that his written threats were not intended to be understood literally: "That is a threat, but it was like I can't take any more of this.  You've got to stay away from me.  I can't take it.  I need out basically."  He said his wife never "acted like she was in fear of" him.  On cross examination, Seremak admitted he had violated the restraining orders.

The jury acquitted Seremak of count 1 but found him guilty on the other four counts.  The trial court granted Seremak probation and ordered him to serve 364 days in county jail, with a total of 881 days of custody credits.

## DISCUSSION

Seremak argues the court erred by admitting certain prior bad act evidence, as well as evidence he previously owned a shotgun.  In his view, the court further erred in "not allowing the defense to briefly re-open its case" to present additional rebuttal evidence about the shotgun.  He also argues the court erred by excluding evidence of his medical condition.  Finally, he argues each of these issues, even if not prejudicial alone, combine to amount to reversible error.  We are not persuaded by any of these arguments.

### A.  *Prior Bad Acts Evidence*

#### 1.  *Additional Facts*

At about 7:00 p.m. on March 6, 2017, Seremak called a customer service line for a company (Kaiser).  The call was recorded, but Seremak was yelling and some of what he said was unintelligible.  During the call, Seremak told the Kaiser customer service agent: "Okay let me be real clear [unintelligible] . . . I will murder them.  I will go in there and I

5

will kill every fucking one of them. You are not going to fucking kill me." The agent then placed Seremak on hold and called police. When a police officer contacted Seremak, he said "that Kaiser was the one . . . harassing him," and that "Kaiser was lying." The officer described Seremak's demeanor as "agitated" and "yelling . . . quite loud." Seremak was arrested and convicted of a misdemeanor for attempted criminal threats (§§ 664, 422).

Seremak testified in this case that he did not mean what he said to the Kaiser agent to be taken literally. He described his statement "I will kill you" as "hyperbole." On cross-examination, the prosecution asked whether he "wanted them to understand that you were making a threat towards them," and Seremak answered "Yeah." On further questioning, he qualified that response, explaining he "want[ed] them to understand the anger," but "never thought they would . . . take it seriously." Seremak testified he pleaded guilty to two counts of attempted criminal threats arising from his statements to the Kaiser agent.[4]

The jury's instruction on the limited use of evidence of an uncharged offense was a modified version of CALCRIM No. 375. The instruction allowed the jury to consider "evidence that the defendant committed another offense of a criminal threat that was not

---

[4] Seremak admitted the plea "still stands," though he tried to "withdraw it."

charged in this case" for the "limited purpose of deciding whether the defendant acted with the intent to commit a criminal threat in this case."[5]

2. *Analysis*

"Evidence of defendant's commission of other crimes, civil wrongs or bad acts is not admissible to show bad character or predisposition to criminality, but may be admitted to prove some material fact at issue such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." (*People v. Cage* (2015) 62 Cal.4th 256, 273; Evid. Code, § 1101.) "'In general, . . . "[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."'" (*People v. Fayed* (2020) 9 Cal.5th 147, 191.) Thus, even if tending to prove material facts, "to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*).) Evidence Code section 352 provides that "[t]he court in its discretion may exclude

---

[5] Seremak's suggestion that evidence of the 2017 criminal threats was also admitted "under a theory of a lack of mistake" is incorrect. The prosecution asked that the evidence be admitted to show intent, not lack of mistake. The prosecution argued to the jury that the 2017 offense showed Seremak's intent in making the threats charged in this case, and emphasized that its use was limited to that "very specific" purpose. The jury's instructions make no mention of lack of a mistake, only intent. During a discussion with defense counsel about the evidence, the court raised lack of mistake as a possible ground for admission of prior bad acts evidence, omitted from defense counsel's listing of some of those grounds. The court's comment, though emphasized in Seramak's briefing, is irrelevant.

7

evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"'[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.'" (*People v. Williams* (2013) 58 Cal.4th 197, 270 (*Williams*).) "'We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352.'" (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

An element of a criminal threats offense under section 422 is "that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out.'" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*).) Evidence of Seremak's intent was therefore highly relevant.

The tendency of the earlier threats to prove Seremak's intent as to the charged statements depends on the degree of similarity. "'[I]f a person acts similarly in similar situations, he probably harbors the same intent in each instance,'" so the "prior conduct may be relevant circumstantial evidence of the actor's most recent intent." (*People v. Robbins* (1988) 45 Cal.3d 867, 879 (*Robbins*), superseded by statute on another ground as stated in *People v. Jennings* (1991) 53 Cal.3d 334.) "[T]o be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the

8

defendant "'probably harbor[ed] the same intent in each instance.'"" (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

We find no abuse of discretion in the trial court's determination that the 2017 threats were sufficiently like the threats alleged here to be admissible as circumstantial evidence of Seremak's "most recent intent." (*Robbins*, *supra*, 45 Cal.3d at p. 879.) The Kaiser incident involved a different victim, who was not Seremak's intimate partner. Nevertheless, the requirement for admissibility is similarity, not identity. (See *People v. Orloff* (2016) 2 Cal.App.5th 947, 950, 956 [charged threats similar enough to be admitted despite involving different contexts and different victims].) Seremak's tone and demeanor on the Kaiser phone call was similar to the verbal threats described by his wife. His choice of words—threatening to "murder" or "kill" the Kaiser agent, as well as others associated with him—was also similar to the charged threats, both written and verbal.

Moreover, Seremak's testimony supports concluding that his intent in each instance was similar. He described his statements to the Kaiser agent as "hyperbole," admitting that he intended the agent to understand them as threats, but insisting he never expected those threats to be taken "seriously." Similarly, he admitted that some of his statements to his wife were, on their face, threats, but said that he had not meant what he said to be taken at face value. It was reasonable for the trial court to deem the prior criminal threats sufficiently similar to be probative of Seremak's intent as to the charged threats.

Finally, we will not disturb the trial court's implicit determination under Evidence Code section 352 that the probative value of the prior bad acts evidence was not outweighed by the probability of undue prejudice, confusing the issues, or misleading the jury. The presentation of the evidence was brief, taking less than 20 minutes, including just over a minute listening to the recorded call between Seremak and the Kaiser agent.[6] The jury was correctly instructed on the limited permissible use of the evidence. The jury was aware of Seremak's criminal conviction arising from the Kaiser incident, reducing the temptation to punish him for uncharged conduct. (See *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1315 ["knowledge that appellant had . . . been punished for his prior transgressions substantially mitigates the kind of prejudice usually associated with the introduction of prior bad act evidence"].) And the earlier threats were no more egregious than the charged offenses. Any damage to Seremak's defense flowed from their probative value on a relevant issue, not any sense in which they would "tend to inflame the jurors' emotions or cause them to punish [Seremak] because of an emotional reaction." (*People v. Cortez* (2016) 63 Cal.4th 101, 129.) The trial court was well within its discretion to find the probative value of the prior bad acts evidence was not substantially outweighed by the probability of undue prejudice, confusing of issues, or misleading the jury.

---

[6] The officer who investigated the Kaiser incident and provided the evidentiary foundation for the recording was called as a witness at 9:57 a.m. He testified, was excused, and then the prosecution admitted several exhibits before the court took a recess at 10:16 a.m. The recording—one minute and two seconds in length, with a transcript that is less than a page long—was played for the jury during the officer's testimony.

10

Seremak argues that the trial court did not engage in a section 352 balancing analysis at all. This argument is belied by the record. "[A]lthough the record must affirmatively show that the trial court weighed prejudice against probative value in admitting evidence of prior bad acts [citations], the trial judge 'need not expressly weigh prejudice against probative value—or even expressly state that he has done so.'" (*People v. Padilla* (1995) 11 Cal.4th 891, 924 (*Padilla*), overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1.) Here, defense counsel argued, in substance, that the evidence of the Kaiser incident was of minimal probative value, was unduly prejudicial, had a tendency to confuse the issues, and should be excluded under Evidence Code section 352.[7] Although the court did not discuss its reasoning when it rejected those arguments shortly thereafter and allowed the evidence to be admitted, or when later requested to revisit the issue, we infer that the court "had in mind the appropriate analytic framework for passing on the admissibility of the evidence, that the court was therefore aware of the need to weigh the evidence under section 352, and thus that it must have done so." (*Padilla*, at p. 924.)

---

[7] Defense counsel said: "I think it confuses the issues for the jury, and under 352 the Court can exclude it. I mean, we're bringing in all this other evidence to say 273.5, domestic violence, and it confuses the issues because it just – it sheds a dark light on my client when—when it doesn't really directly go to whether or not he committed these crimes . . . If we're saying that that shows intent to commit a 422, the problem, I think, is just because of the context of how that happened and the context of how this happened, I think the Court should exclude it because it confuses the issues." Thus, the People's suggestion in passing that Seremak "never requested that the court engage in" an Evidence Code section 352 analysis of the prior bad acts evidence is without merit.

11

Seremak has not demonstrated an abuse of the trial court's discretion, either as to the admissibility of the prior bad acts evidence under Evidence Code section 1101 or in conducting the Evidence Code section 352 balancing analysis.

## B. *Evidence of Shotgun Ownership*

Seremak argues the trial court erred by admitting evidence he previously owned a shotgun. He also argues the court erred when, after the parties had rested but before jury instructions and closing arguments, it refused to allow the defense to reopen its case to present additional evidence the shotgun had been destroyed in 2012 or 2013, or to allow a brief continuance to allow the defense to attempt to obtain such evidence. We reject these arguments.

### 1. *Additional facts*

The prosecutor asked Seremak's wife whether he owned a firearm or had access to a firearm when he made the charged threats against her. She testified he did not. The defense raised no objections to this line of questioning.

On cross examination, the prosecutor asked Seremak whether he owned a firearm at the time of the 2017 Kaiser incident. He said he did not. He acknowledged previously owning a "Mossberg shotgun," but said he had not owned it since "2012 or 2013." The defense raised no objections to this line of questioning, either.

In rebuttal, the prosecution recalled the police officer who had investigated the 2017 Kaiser incident. The officer testified he ran a record check for gun ownership as part of his investigation. Over defense hearsay and foundation objections, the record

12

check report was admitted as a business record, and showed Seremak was the registered owner of a Mossberg shotgun. The officer also testified, without defense objection, that he had asked Seremak about the gun. Seremak said "'It's in my house, and you'll never find it.'"

The day after both the prosecution and the defense rested, as counsel and the court were finalizing the jury's instructions and handling other matters outside the presence of the jury, Seremak asked to address the court against the advice of his counsel. The court permitted him to do so. Seremak told the court he had never owned a gun during his marriage, and that the officer who testified about the Mossberg shotgun had committed "blatant perjury." Seremak explained: "I can prove it. I turned that gun into Huntington Beach in 2012, the Mossberg shotgun[,] and they destroyed it. Five years later that gun does not exist. I can't be going around telling him 'I hid it' or 'You're never going to find it' if it's destroyed five years earlier."

Seremak's counsel confirmed the record check report previously admitted into evidence did not reflect the shotgun had been destroyed, and that it was "supposed to say" if it had been destroyed through the police department. Seremak asked if they could "wait one day, go to Huntington Beach?" His counsel said he had the record check report "for years or for as long as I've had the case" but he had not "gone to Huntington Beach" to "confirm[] a shotgun destroyed," explaining "today is the first day I've heard the shotgun was destroyed." The court said it would not allow a continuance, as it had "a jury waiting," and the judge had a scheduled medical leave for a surgery, so "[w]e need

13

to do this today, and get this to the jury today." The court ruled: "[F]or right now I'm not going to take any action based on the statement of the defendant, and [counsel] can do your arguments." Seremak's counsel then asked: "Just for the record, if the defense was to ask for a continuance for that purpose that we just found out, the Court would deny it, right?" The court responded: "Yes."

2. *Analysis*

Seremak argues the trial court erred by admitting evidence he previously owned a shotgun, asserting it lacked relevance and the trial court failed to weigh probative value against undue prejudice under Evidence Code section 352. These arguments were forfeited because they were not timely raised.[8] (Evid. Code, § 353, subd. (a); *People v. Holt* (1997) 15 Cal.4th 619, 666.)

Moreover, the trial court would have been well within its discretion to admit evidence that Seremak owned or had access to a shotgun even over a timely defense objection on relevance or Evidence Code section 352 grounds. If Seremak owned a firearm, that would tend to support several aspects of the prosecution's case on the criminal threats counts, including whether Seremak intended his threats to be taken as such, whether the threats caused his wife to experience "'sustained fear for . . . her own safety or for . . . her immediate family's safety,'" and whether that fear was reasonable

---

[8] After the close of evidence, defense counsel said the evidence of Seremak's shotgun ownership had "never been something that, in my mind, has been relevant in this case," and asserted he "did make those objections at the time and they were overruled." The record, however, does not support counsel's recollection of what objections he made.

14

under the circumstances.  (See *Toledo*, *supra*, 26 Cal.4th at p. 228 [listing elements of offense].)  Additionally, once Seremak testified he never owned a shotgun during his marriage, any evidence to the contrary became relevant to his credibility.  (Evid. Code, §§ 210, 780, subd. (i).)

We also disagree with Seremak that the evidence of his gun ownership was "highly prejudicial" because "it would have led the jury to believe that [he] was a 'loose cannon,' running around with a Mossberg shotgun."  There was no argument at trial, by the prosecution or anyone else, that Seremak ever brandished or otherwise used the shotgun, only that he owned it.  We reject the premise that gun ownership is an inherently prejudicial fact; in fact, Seremak's wife testified she had been a gun owner herself at one time, before her marriage.  The primary relevance of the shotgun evidence, after Seremak's wife testified she was not aware of him owning or having access to a firearm, and he said he no longer owned one as of 2017, was how that testimony reflected on his credibility.  The shotgun itself was not mentioned in the prosecution's closing argument.

Seremak's reliance on *People v. Jefferson* (2015) 238 Cal.App.4th 494 (*Jefferson*) in support of a different conclusion about prejudice is misplaced.  In *Jefferson*, evidence that the defendant owned two legally registered firearms was admitted as evidence the defendant knew the concealed firearm found in his possession was stolen.  (*Jefferson*, at p. 507.)  The court of appeal rejected that reasoning, finding "the logical chain connecting the challenged evidence to the disputed issue" to be "so attenuated as to be almost speculative."  (*Ibid.*)  Particularly given the strength of other evidence of the

defendant's knowledge, the challenged evidence added "next to nothing," and thus was of "vanishingly slight" probative value. (*Ibid.*) Moreover, the prosecution argument about the registered firearms emphasized them not as evidence of the defendant's knowledge, but rather appealed to the jurors' emotions, painting the defendant as a "dangerous person in a dangerous neighborhood probably engaged in a dangerous profession, drug dealing." (*Id.* at pp. 507-508.) Our case is different; the logical connection between the evidence and matters of relevance is not so attenuated, the evidence's probative value is greater, and the prosecution focused on relevant matters, without appeal to any emotional bias conceivably evoked by Seremak's gun ownership.

In addition to challenging the shotgun evidence's admission, Seremak argues the trial court erred by refusing to reopen the case to allow him to testify further about the gun, to recall the police officer for further testimony, or to allow a "brief continuance" for the defense to "verify the status of the shotgun." The defense, however, did not even arguably or ambiguously suggest reopening the presentation of evidence to allow the defense to recall Seremak or the officer to the stand. On these points, Seremak has not "offer[ed] any reason for us to deviate from the general rule that '"[a]n appellate court will ordinarily not consider procedural defects or erroneous rulings [in connection with relief sought or defenses asserted], where an objection could have been, but was not presented to the lower court by some appropriate method."'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1000.)

16

The defense did propose a "brief continuance," albeit phrased as a hypothetical, for the purpose of developing additional evidence that, if discovered, could be presented to the jury after reopening the defense case. The trial court was unequivocal that it would deny any such request. "'[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court.'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 650.) "'The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked.'" (*Ibid.*) In ruling on a continuance motion, "[t]he court considers '"not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion."'" (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1037.)

We find no abuse of discretion in the trial court's indicated ruling here. There would be some benefit to the defense if it could prove the shotgun had in fact been turned over to police in 2012 or 2013, so Seremak was telling the truth when he testified he no longer had it by the time of the 2017 Kaiser incident. Nevertheless, the likelihood such a benefit would result from a continuance was minimal. Defense counsel represented that the information defendant hoped to discover from the Huntington Beach police department should have been reflected on the record check already in evidence, if it existed. The burden of a continuance on the jurors and the court would have been substantial, as the case was otherwise ready for the jury to be instructed and then begin its

17

deliberations. A continuance could also have required a new judge to step in, as the trial judge had a medical leave scheduled to begin the next day. It was reasonable for the trial court to conclude substantial justice did not require delaying the trial to allow the defense to pursue a late-discovered investigatory path that conceivably could, but most likely would not, yield any new evidence.

Seremak has not demonstrated the trial court abused its discretion, either by admitting the shotgun evidence or by denying the defense a continuance to attempt to develop additional rebuttal evidence on the issue.

## C. Evidence of Seremak's Medical Condition

### 1. Additional facts

Before trial, defense counsel made an oral motion in limine, proposing to call a doctor to testify that Seremak "suffers from lupus, and he has several neurological disorders." Counsel explained that, because of that "ailment...[i]f someone were to hit him, he would be in extreme pain." Counsel said the doctor "can't testify that him having this ailment, even with the neuropathy, would not allow him to hit somebody else," and conceded "[i]t's not a defense." Counsel argued, however, the evidence "would go to [the defense's] theory, which is that [Seremak] had this ailment, and he would not hit anybody or assault anybody." The court expressed doubt about the defense's theory ("Okay. I don't see that.") and denied the motion, but gave leave to renew it after the People's presentation of evidence.

18

During the prosecution's case-in-chief, defense counsel proposed to cross-examine Seremak's wife about a text message string between her and Seremak, included in one of her restraining order requests, in which they discussed his "infusion."[9] Defense counsel proposed to ask Seremak's wife what that meant, in the expectation she would say "it's an infusion for lupus." Counsel explained the relevance of such testimony as follows: "The reason I want to do that is because my client, I believe, should be allowed to testify that, one, he's on medication, and, two, the medication makes it difficult for him to understand what I'm saying to him, and that is the reason why he answers slow."

The trial court excluded from evidence the text message mentioning Seremak's "infusion," offering to "revisit" the issue at a later point but stating "as of right now, that's opening a can of worms that is just a whole other trial on his medical condition." The court noted the lack of any evidentiary foundation connecting a lupus diagnosis to Seremak's manner of speaking, noting that defense counsel is "not a doctor and . . . the jury can't rely on what you're saying about that . . . or even argue it. You can't just say that's why he's answering slowly." The court expressed willingness to reconsider the issue with an offer of proof from a doctor.

After that ruling, defense counsel asked for clarification: "So when I cross examine [Seremak's wife], is it the Court's ruling that I can't ask her whether or not my

---

[9] Counsel read the text exchange into the record as follows: "'You told me the infusion was going to be late. You don't care about my health. You would stop complaining about my anger and how I treat you.' Her, 'Why was your infusion so late today?'"

client, one, had a disability; two, you knew that that disability would make him weak when he was at home, and you took advantage of him when he had that disability because you knew he couldn't respond or retaliate." The court agreed counsel had correctly understood its rulings, and that "it's not admissible to go into that area."

Before Seremak testified, his counsel made an offer of proof that a doctor was prepared to testify that his medications for lupus "would, in fact, slow him down or be some impediment to how he testifies." The court made an initial ruling the doctor would not be permitted to testify, but with the caveat that if it became "clear" Seremak's testimony was "abnormal in some way," it would consider admission of evidence as to why. Several times during Seremak's testimony, the court sustained prosecution objections and struck statements by Seremak about his own medical condition.

After Seremak's testimony, the court made a record of its observations as follows: "It did not appear to me that the defendant acted any differently than any other witness. He wasn't uncomfortably slow in his responses nor was he unable to follow the questions, and so I'm finding that there was no slowness by the defendant in answering questions." Defense counsel initially disagreed. The court asked if counsel thought "the doctor should say that the reason he answered so slowly was because he has lupus." Defense counsel responded: "No.[...] I just think the person who I meet at the jail and talk to sometimes at the jail, that's not the person who testified. That's all. It was a little slower, and it was a little less intentional, but it came out, and he was—he looked at the jury. He seemed to understand my questions. That's all."

2. *Analysis*

Seremak argues the medical evidence was relevant in three respects.  First, in his view, it "would have shed doubt on" whether he "would become embroiled in a physical confrontation" with his wife.  Since he was acquitted on count 1, however, the only charge alleging physical violence, this is a moot point.

Second, Seremak proposes the excluded medical evidence was relevant to the criminal threats charges, because it would have tended to show he "did not have the capacity to carry out the threats against his wife and also negate her assertion of fear of him."  The record, however, does not support this characterization of the proffered evidence.  His trial counsel said the doctor he wished to call as a witness "can't testify that [Seremak] having this ailment, even with the neuropathy, would not allow him to hit somebody else," let alone that he was physically incapable of carrying out threats of violence by some other means.  And Seremak testified that he *was* physically capable of hitting his wife, and she "would have" been injured if he did; he just chose not to.[10]  Certainly, in the abstract, there might be medical evidence that would be probative in the manner Seremak suggests, but in this context it does not appear the medical evidence he

---

[10]  On direct examination, Seremak's trial counsel asked him whether, when his wife was physically abusive to him, he could have "hit her back."  Seremak responded "Absolutely.  Yeah."  His counsel then asked: "But you didn't?" and Seremak confirmed "I didn't.  Counsel asked: "If you had hit her back, would it be fair to say that she might have suffered some injury?"  Seremak responded: "Oh, she would have.  Yeah, I'm bigger."

21

was actually prepared to present would reasonably and non-speculatively support the defense's theory.

Third, Seremak argues "the evidence would have explain[ed] to the jury the slow and irregular cadence of appellant's speech in court." The trial court made a record, however, that it had not observed Seremak's speech to be "uncomfortably slow" or that he otherwise "acted any differently than any other witness." Defense counsel conceded Seremak had done fine on the stand, and answered "No" when asked if "the doctor should say that the reason he answered so slowly was because he has lupus." Thus, the trial court reasonably viewed Seremak's proposed medical evidence to have minimal probative value.

Even accepting for the sake of argument the evidence would support the defense's version of events to some extent, the trial court was reasonably concerned that its admission would derail the proceedings into "a whole other trial" on Seremak's medical condition. The court also reasonably could have viewed the medical evidence as more likely to provoke an emotional response of sympathy for Seremak than to shed light on whether he committed any of the charged offenses. (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1064 [court properly excluded evidence that could provoke undue sympathy for the defendant].) We therefore find no appropriate basis to disturb the trial court's exercise of its "'broad discretion'" (*Williams*, *supra*, 58 Cal.4th at p. 270) under Evidence Code section 352.

*D. Cumulative Error*

Seremak contends he is entitled to reversal because of cumulative error. "A series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found no errors, harmless or otherwise. There is no series of trial errors to cumulate.

### DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____
J.

We concur:

McKINSTER _____
Acting P. J.

FIELDS _____
J.